MEMORANDUM OPINION
 

 JOHNSTONE, Senior District Judge.
 

 This matter is before the Court for ruling on Defendants’ Motions to Dismiss [dkt.# 10, 47, 48, 49, 50, 52,
 
 &
 
 53], The Motions have been fully briefed and are now ripe for review. For the reasons set forth herein, the Motions to Dismiss will be granted and this case will be dismissed as to all Defendants.
 

 Background, Facts and the Complaint
 

 Plaintiffs brought this action alleging negligence, strict liability, and RICO violations against various groups of Defendants based on the underlying theory that the Defendants’ actions or lack thereof in creating and distributing a movie, numerous video games, and various internet materials caused their daughters’ deaths and subsequent loss of earning capacity. As common to all counts, the following facts are set forth in the complaint:
 

 On the morning of December 1, 1997, Michael Carneal, then fourteen years of age, took six guns, including a pistol, to the Heath High School in McCracken County, Kentucky. Carneal waited for a daily voluntary student prayer session to end. He then shot Jessica James, Kayce Steger, and Nicole Hadley, all three of whom were members of the prayer group, to death. He wounded five others.... In the aftermath of the massacre the police seized Michael Car-neáis computer. Carneal was an avid computer user who logged onto the Internet to consume material that was obscene, obscene for minors, pornographic, sexually violent, and/or violent in content. Law enforcement officials also learned that Carneal was a consumer of violent computer and video games ... [and] that Carneal was a consumer of movies containing obscenity, obscenity for minors, pornography, sexual violence, and/or violence. One such movie that Carneal consumed was
 
 The Basketball Diaries.
 
 In this movie a student ... graphically massacres his classmates with a shotgun.... Dr. Diane Schetky ... an adolescent psychiatrist ... concluded that Carneal was profoundly influenced by his exposure to the above violent/pornographic media and that: ‘[t]he media’s depiction of violence as a means of resolving conflict and a national culture which tends to glorify violence further condones his thinking.’ Michael Carneal was found guilty of second-degree murder and sentenced to twenty-five years in jail without possibility of parole.
 

 Based on the foregoing, Plaintiffs, the parents of the deceased children, filed the instant complaint against three distinct groups of Defendants.
 

 The Basketball Diaries Defendants
 

 In count one of the complaint, Plaintiffs sue the makers and distributors of a movie
 
 *801
 
 titled
 
 The Basketball Diaries.
 

 [1]
 

 Plaintiffs describe the movie as being “a nihilistic glamorization of irresponsible sex, senseless and gratuitous violence, hatred of religion, disregard of authority, castigation of the family, drug use, and other self-destructive behaviors.” According to Plaintiffs, the
 
 Dianes
 
 Defendants “fabricated a gratuitous and graphic murder spree for the sole purpose of hyping the movie and increasing its appeal to young audiences. This had the effect of harmfully influencing impressionable minors such as Michael Carneal and causing the shootings.”
 

 The Video Games Defendants
 

 In count two of the complaint, Plaintiffs sue the creators and distributors of various video games,
 
 [2]
 
 alleging that the Video Games Defendants “manufactured and/or supplied to Michael Carneal violent video games which made the violence pleasurable and attractive, and disconnected the violence from the natural consequences thereof, thereby causing Michael Carneal to act out the violence ... [andj trained Carneal how to point and shoot a gun in a fashion making him an extraordinarily effective killer without teaching him any of the constraints or responsibilities needed to inhibit such a killing capacity.”
 

 The Internet Defendants
 

 In count three of the complaint, Plaintiffs sue various owners of internet websites.
 
 [3]
 
 According to Plaintiffs, the Internet Defendants “distributed to Michael Carneal, a minor, by means of the Inter-not, certain pornographic and obscene material. This material influenced Carneal in such a fashion that it was a legal cause of the injuries to Plaintiffs’ decedents. Such material, among other effects, served to further attenuate actions from consequences in Carneal’s mind, made virtual sex pleasurable and attractive, provoked violence in Carneal, and disconnected the violence from the natural consequences thereof, thereby causing Michael Carneal to act out the violence.”
 

 In addition, Plaintiffs allege in count four that the Internet Defendants “engaged in a pattern of racketeering activity by distributing certain obscene matter by means of the Internet through interstate commerce to Michael Carneal, a minor in violation of state and federal obscenity and obscenity to minor statutes.”
 

 Allegations Common To All Defendants
 

 After making the foregoing specific allegations as
 
 to each group
 
 of Defendants, Plaintiffs bring some twenty-three claims sounding in negligence and strict products liability in counts one through three common to all Defendants. Among these various claims are the allegations: that the Defendants knew or should have known that copycat violence would result from the use of their products and materials; that Defendants knew or should have known that their products and materials created an unreasonable risk of harm because minors would be influenced by the effect of their products and materials and then would cause harm; that Defendants knew
 
 *802
 
 or should have known that their products and materials were in an unreasonably defective condition and likely to be dangerous for the use for which they were supplied; and that Defendants failed to exercise reasonable care to inform consumers of the dangerous condition of their products and materials or of the facts which made their products and materials likely to be dangerous.
 

 The Motions to Dismiss and the Failure to State a Claim Standard
 

 Defendants filed various motions to dismiss these claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure arguing that Plaintiffs’ allegations fail to state a claim upon which relief can be granted. When evaluating a 12(b)(6) motion to dismiss, the Court liberally construes a plaintiffs claim and will grant the motion to dismiss only if “it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.”
 
 Windsor v. The Tennessean,
 
 719 F.2d 155, 158 (6th Cir.1983)(citing
 
 Conley v. Gibson,
 
 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In reviewing a plaintiffs claim, Rule 12(b)(6) requires the court to accept all factual allegations as true because the purpose of the motion “is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true.”
 
 Mayer v. Mylod,
 
 988 F.2d 635, 638 (6th Cir.1993). However, “[o]nly well-pleaded facts ... must be taken as true. The trial court need not accept as true legal conclusions or unwarranted factual inferences.”
 
 Lewis v. ACB Business Serv., Inc.,
 
 135 F.3d 389 (6th Cir.1998) (citations omitted).
 

 Therefore, as the purpose of the motion to dismiss is to challenge the legal theory of the complaint, the Court begins its analysis by examining each cause of action separately to determine whether, as a matter of law, Plaintiffs have stated a claim upon which relief can be granted.
 

 Plaintiffs’ Causes of Action for Negligence
 

 Plaintiffs allege various negligence claims against all Defendants. To bring these causes of action pursuant to Kentucky law, Plaintiffs must establish the three fundamental elements common to all negligence claims: “a duty, a violation thereof, and consequent injury. The absence of any one of the[se] three elements is fatal to the claim.”
 
 M & T Chemicals, Inc. v. Westrick,
 
 525 S.W.2d 740, 741 (Ky. 1974).
 

 1).
 
 Did the Defendants Owe a Duty of Care?
 

 Kentucky law dictates that “[ejvery person owes a duty to every other person to exercise ordinary care in his activities to prevent any foreseeable injury from occurring to such other person.”
 
 Id.
 
 Plaintiffs allege that Defendants breached the legal duty of ordinary care owed to them by: 1) designing, manufacturing, and distributing products and materials they knew or should have known were likely to affect minors in such a way as to result in harm to others; and 2) failing to warn the public of the unreasonably dangerous condition and characteristics of their products and materials. However, “[pjrior to application of the universal duty of care to a particular set of facts, it must appear that the harm was foreseeable and the facts must be viewed as they reasonably appeared to the party charged with negligence, not as they appear based on hindsight.”
 
 North Hardin Developers, Inc. v. Corkran,
 
 839 S.W.2d 258, 261 (Ky.1992). Therefore, before Defendants can be charged with owing a duty of care, the Court must first determine whether the injuries in question were foreseeable.
 

 Plaintiffs argue that “whether the murders ... were foreseeable is an issue of fact that must be decided by the jury.... If the Defendants ‘knew or should have known’ of the potential for harm to a plaintiff by an actor then liability attaches.... Plaintiffs have pled as
 
 *803
 
 much against all defendants; those allegations must be taken as true.” [dkt.# 68, p. 10]. Essentially, Plaintiffs argue that because they alleged foreseeability in their complaint, and because Rule 12(b)(6) dictates that a court must accept factual allegations as true for purposes of a motion to dismiss, they have established that a duty was owed. However, this court is “required to accept only well-pleaded facts as true, not the legal conclusions that may be alleged or that may be drawn from the pleaded facts.”
 
 Blackburn v. Fisk University,
 
 443 F.2d 121, 124 (6th Cir.1971). Under Kentucky law, whether a defendant owed a duty is a matter of law for the Court to determine.
 
 See Mullins v. Commonwealth Life Ins. Co.,
 
 839 S.W.2d 245, 248 (Ky.1992).
 

 Kentucky courts have stated that “whether or not a duty exists is but a conclusion of whether a plaintiffs interests are entitled to legal protection against the defendant’s conduct. The existence of a duty is an issue of law, and a court, when making the determination of such existence, engages in what is essentially a policy determination.”
 
 Sheehan v. United Services Automobile Assoc.,
 
 913 S.W.2d 4, 6
 
 (Ky.Ct.App.1996)(citing Mullins,
 
 839 S.W.2d at 248). Part of the determination as to “whether a plaintiffs interests are entitled to legal protection against the defendant’s conduct” and therefore a duty owed, depends on whether the plaintiffs injuries were foreseeable to the defendant. For support of their proposition that foreseeability is a question of fact which must be decided by a jury, Plaintiffs cite as authority
 
 Schrand v. Grant,
 
 1999 WL 540877 (Ky.Ct.App.)(a non-final opinion that is not to be cited as authority);
 
 Watts v. KS. & H.,
 
 957 S.W.2d 233, 239 (Ky. 1997);
 
 Finney Company Inc. v. Monarch Const. Co.,
 
 670 S.W.2d 857, 863 (Ky.1984)(dissenting opinion); and
 
 Workman v. Columbia Natural Resources,
 
 864 F.Supp. 638 (E.D.Ky.1994). Contrary to Plaintiffs’ analysis, the common rationale found in these opinions is that the issue of foreseeability is submitted to the jury only in cases where there might be a reasonable difference of opinion as to whether the injuries were foreseeable. “fWjhere the court would conclude as a matter of law that it was clearly unreasonable to foresee the potential harm from the misconduct involved,” the question is not one for a jury.
 
 See Grayson Fraternal Order of Eagles v. Claywell,
 
 736 S.W.2d 328, 334 (Ky.1987).
 

 At this juncture, the Court must decide as a matter of law whether the facts, as alleged in the complaint and accepted as true for the purposes of the motion to dismiss, present a situation where there might be a reasonable difference of opinion in regards to the foreseeability of Plaintiffs’ injuries. (-Simply put, would reasonable people conclude that it was foreseeable to Defendants that as a result of disseminating their products and failing to warn of the materials contained therein, a fourteen-year-old boy who played then1 video games, watched their violent movie, and viewed their provocative website materials would go to a friend’s house, steal guns, take the guns to school the next day, and gun down his classmates during a prayer session?
 

 Under the facts alleged in the complaint, which are accepted as true for purposes of these motions, the Court concludes as a matter of law that it was clearly unreasonable to expect Defendants to have foreseen Plaintiffs’ injuries from Michael Carneal’s actions. Because the injuries were unforeseeable, Defendants did not owe a duty of care upon which liability can be imposed.
 

 In arriving at this decision, the Court relies on and is bound by the Sixth Circuit’s rationale in
 
 Watters v. TSR, Inc.,
 
 904 F.2d 378 (6th Cir.1990). There, the mother of a boy who committed suicide filed negligence and strict liability claims against the manufacturers of a game called Dungeons
 
 &
 
 Dragons.
 
 See id.
 
 She alleged that as a result of her son Johnny’s exposure to the game, he lost control and
 
 *804
 
 committed suicide.
 
 See id.
 
 at 380. As in this case, the decedent’s mother alleged that the defendant had violated a duty of care in disseminating the game and by failing to warn of the “possible consequences” of playing the game.
 
 See id.
 
 at 381. Similarly, the defendant argued that it did not owe a duty of care because Johnny Burnett’s suicide was unforeseeable.
 
 See id.
 
 Although the claims were premised on state law, this Court decided the matter on constitutional grounds reasoning that the First Amendment barred the imposition of liability.
 
 See id.
 
 On appeal, the Sixth Circuit affirmed the outcome of the case but reasoned that the matter should have been decided on state law grounds.
 
 See Watters,
 
 904 F.2d at 381. In resolving the matter pursuant to Kentucky law, the Sixth Circuit reasoned that, “[t]o submit this case to a jury on either theory, it seems to us, would be to stretch the concepts of foreseeability and ordinary care to lengths that would deprive them of all normal meaning.”
 
 Id.
 

 Here, as in
 
 Watters,-
 
 it would also “stretch the concepts of foreseeability” to submit this case to a jury. Reasonable people would not conclude that it was foreseeable to Defendants that Michael Car-neal, a boy who played their games, watched their movie, and viewed their website materials, would murder his classmates. Even accepting the pleaded facts as true, that Michael Carneal was an avid consumer of violent video games, nihilistic movies, and obscene internet materials and was influenced by all of these events, does not make the murders foreseeable to the Defendants. Just as Johnny Burnett’s suicide in
 
 Watters
 
 was unforeseeable to the distributors of the game, Dungeons and Dragons, so was Michael Carneal’s killing spree unforeseeable to the Video Games,
 
 Basketball Diaries,
 
 and Internet Defendants. The fact that Michael Carneal chose to kill his classmates rather than himself does not make his actions any more foreseeable. As the Sixth Circuit reasoned in
 
 Watters:
 

 The defendant cannot be faulted, obviously, for putting its game on the market without attempting to ascertain the mental condition of each and every prospective player. The only practicable way of insuring that the game could never reach a ‘mentally fragile’ individual would be to refrain from selling it at all— and we are confident that the courts of Kentucky would never permit a jury to say that simply by marketing a parlor game, the defendant violated its duty to exercise ordinary care.... Were the courts of Kentucky prepared to say that works of the imagination can be linked to a foreseeable danger of antisocial behavior, thereby giving rise to a duty to warn, one would expect to find Kentucky caselaw to that effect in lawsuits involving television networks, book publishers, or the like. There is no such caselaw.
 

 Id.
 
 at 382. The facts in this case also present a situation where the manufacturers and distributors would likewise be charged with attempting to ascertain the mental condition of consumers before marketing their materials.
 

 Plaintiffs argue that “[t]his case is factually unrelated to
 
 Watters
 
 ” and suggest that “[sjurely the Sixth Circuit Court of Appeals and the Kentucky courts would find the smut in this action utterly unlike the creative “learning tool” in
 
 Watters.”
 
 [dkt.# 68, p. 14-15], Instead, Plaintiffs state their claims are “akin” to those found in
 
 Byers v. Edmondson,
 
 712 So.2d 681 (La.App. 1st Cir.1998),
 
 cert. denied,
 
 526 U.S. 1005, 119 S.Ct. 1143, 143 L.Ed.2d 210 (1999). In
 
 Byers,
 
 a shooting victim brought negligence and intentional tort claims against the directors, producers, and distributors of the movie,
 
 “Natural Bom Killers.” See id.
 
 at 684. The victim, who was rendered paraplegic by the shooting, alleged that the shooter “went upon a crime spree ... as a result of seeing and becoming inspired by the movie.”
 
 Id.
 
 The movie defendants moved to dismissed the claims on the basis that they did not owe a
 
 *805
 
 duty to the plaintiff.
 
 See id.
 
 The trial court dismissed the action, but on appeal the Louisiana Court of Appeals reversed the dismissal of the entire action and remanded the matter for further proceedings.
 
 See id.
 

 Plaintiffs argue that the holding in
 
 Byers
 
 supports their position because the Louisiana Court of Appeals “found that a cause of action premised in negligence had properly been asserted by the shooting victim.” [dkt.# 68, p. 16]. An examination of the
 
 Byers
 
 opinion reveals just the contrary. The appellate court did not find that a negligence action had been properly asserted. Rather, it affirmed the trial court’s dismissal of the negligence claims holding that “a defendant does not owe a duty to protect a person from the criminal acts of third parties absent a special relationship which obligates the defendant to protect the plaintiff from such harm.”
 
 Id.
 
 at 687. And, while the appellate court reversed the trial court’s dismissal of the intentional tort claims, it did so only on the grounds that the plaintiff had alleged enough facts to establish a cause of action for an intentional tort claim.
 
 See Byers,
 
 712 So.2d at 687, 689. Here, Plaintiffs do not bring their claims pursuant to intentional tort theories but instead base their claims on theories of “negligence, product liability and violation of the Racketeer Influenced and Corrupt Organizations Act.” [dkt.# 68, p. 6; see also dkt.# 1]. Plaintiffs’ reliance on
 
 Byers
 
 is wholly misplaced because that court refused to impose a duty on the movie defendants and affirmed the dismissal of the negligence claims.
 

 Other courts across the country have also refused to impose a duty on defendants in like situations. For example, in
 
 McCollum v. Columbia Broadcasting Systems, Incorporated,
 
 the plaintiffs filed suit alleging that Ozzy Osbourne’s song, “Suicide Solution” caused a child to commit suicide. See 202 Cal.App.3d 989, 249 Cal.Rptr. 187 (1988). In dismissing the action, the California court reasoned:
 

 [I]t is simply not acceptable to a free and democratic society to impose a duty upon performing artists to limit and restrict their creativity in order to avoid the dissemination of ideas in artistic speech which may adversely affect emotionally troubled individuals. Such a burden would quickly have the effect of reducing and limiting artistic expression to only the broadest standard of taste and acceptance and the lowest level of offense, provocation and controversy. No case has ever gone so far. We find no basis in law or public policy in doing so here.
 

 Id. at 1005-06, 249 Cal.Rptr. 187. Another example is
 
 Zamora v. CBS
 
 where a plaintiff filed suit alleging that his exposure to television violence caused him to become “desensitized to violent behavior,” to develop a “sociopathic personality,” and to kill his eighty-three-year-old neighbor.
 
 See 480
 
 F.Supp. 199 (S.D.Fla.1979). The Florida court dismissed the complaint on the basis that the defendants did not owe a duty and reasoned that:
 

 [T]he plaintiffs seek the imposition of a duty (a standard of care) which has no valid basis and would be against public policy. A recognition of the ‘cause’ claimed by the plaintiffs would provide no recognizable standard for the television industry to follow. The impositions pregnant in such a standard are awesome to consider. Here the three major networks are charged with anticipating the minor’s alleged voracious intake of violence on a voluntary basis; his parents’ apparent acquiescence in this course, presumably without recognition of any problem and finally that young Zamora would respond with a criminal act of the type in question. Again, wholly apart from additional procedural problems which should be noted, the question is appropriate; how and why should the Court create such a wide expansion in the law of torts in Florida? (passing for the moment the important considerations presented by the First Amendment). The clear answer is that
 
 *806
 
 such expansion is not warranted.
 
 Indeed, this Court lacks the legal and institutional capacity to identify isolated depictions of violence, let alone the ability to set the standard for media dissemination of items containing ‘violence’ in one form or the other.
 

 Id.
 
 at 202 (emphasis added);
 
 see also Davidson v. Time Warner, Inc.,
 
 1997 WL 405907 (S.D.Tex.l997)(holding that it was unforseeable to producers of rap music that by distributing 2Pacalypse Now, which contained a song about “cop killings,” a person would kill a police officer);
 
 Sakon v. Pepsico., Inc.,
 
 553 So.2d 163, 166 (Fla.1989)(holding that it was unforeseeable that a child would imitate a stunt in a commercial).
 

 Careful consideration of the Sixth Circuit’s analysis in
 
 Watters
 
 and the rationales fotmd in case law from other jurisdictions lead this Court to believe that Kentucky courts would not impose a duty of care on the Defendants. Nothing Defendants did or failed to do could have been reasonably foreseen as a cause of injury. In addition to the foreseeability factor, this Court also finds another basis for holding that Defendants did not owe a duty of care. In
 
 Watters,
 
 the Sixth Circuit articulated a significant observation in regards to the imposition of a duty of care in cases such as this.
 
 See
 
 904 F.2d at 383. Explicitly, it stated:
 

 A Kentucky court considering the application of Kentucky’s common law in this situation would obviously be aware of the constitutional problems looming in the background — and if possible, we believe, such a court would avoid applying the common law in a way that would bring the constitutional problems to the forp. The constitutional problems would be avoided, of course, by holding that the plaintiff failed to show a justiciable issue as to any breach of a recognized legal duty — and that is where we think Kentucky courts would come out.
 

 Id.
 
 This Court adopts this observation as a further reason for rejecting Plaintiffs’ argument that a legal duty should be imposed. Because Defendants owed no duty to Plaintiffs as a matter of law, the negligence claims must be dismissed.
 

 So that Plaintiffs will fully understand the problems in bringing their negligence claims, the Comet will proceed to address a second barrier — the . superseding cause doctrine.
 

 2).
 
 The Superseding Cause Doctrine
 

 The Sixth Circuit has stated that “there can be no liability for negligence if the negligence is not shown to have ‘caused’ the injury complained of.”
 
 Watters,
 
 904 F.2d at 383. In Kentucky, the chain of causation may be broken by “facts [that] are legally sufficient to constitute an intervening [superseding] cause.”
 
 Montgomery Elevator Co. v. McCullough,
 
 676 S.W.2d 776, 780 (Ky.1984). If an intervening act is not a “normal response” to the original tortious act, it is an “extraordinary” act which breaks the chain of causation.
 
 See
 
 RESTATEMENT SECOND OF TORTS § 444. Ultimately, if the act consists of facts “of such ‘extraordinary rather than normal’ or ‘highly extraordinary’ nature, unforeseeable in character, [it will] relieve the original wrongdoer of liability to the ultimate victim.’”
 
 Montgomery Elevator,
 
 676 S.W.2d at 780
 
 (quoting House v. Kellerman,
 
 519 S.W.2d 380, 382 (Ky.1974)).
 

 Plaintiffs argue that whether Michael Carneal’s actions were a superseding cause is a question of fact that must be decided by a jury. Contrary to Plaintiffs’ argument, the Kentucky Supreme Court has held that “[t]he question of whether an undisputed act or circumstance was or was not a superseding cause is a legal issue for the court to resolve, and not a factual question for the jury.”
 
 House v. Kellerman,
 
 519 S.W.2d 380, 382 (Ky.1974). Whether an intervening act is a superseding cause becomes a factual question for the jury only when the actual occurrence of the intervening act is in dispute.
 
 See
 
 
 *807
 

 id.
 
 at 388. Here, Plaintiffs admit in their complaint that Michael Carneal’s conduct was an intervening act and it is undisputed that Plaintiffs’ daughters died at the hands of Michael Carneal. Therefore, whether Michael Carneal’s intervening acts were a “superseding cause” is a legal issue for this Court to resolve.
 

 The Sixth Circuit’s opinion in
 
 Watters
 
 demonstrates the operation of the superseding cause doctrine in Kentucky.
 
 See
 
 904 F.2d at 383-84. When holding that Johnny Burnett’s suicide was an intervening, superseding cause which relieved the manufacturers of the game Dungeons & Dragons of liability, the Sixth Circuit stated that “[c]ourts have long been rather reluctant to recognize suicide as a proximate consequence of a defendant’s wrongful act ... We cannot tell why [Johnny committed suicide]. His death surely was not the fault of his mother, or his school, or his friends, or the manufacturer of the game he and his friends so loved to play. Tragedies such as this simply defy rational explanation, and courts should not pretend otherwise.”
 
 Id.
 

 Plaintiffs argue that “[u]nlike
 
 Watters,
 
 the issue before this Court is whether the criminal act of homicide by a child supersedes an original actor’s liability.
 
 Watters
 
 is a fact specific decision limited to suicides.” [dkt.# 68, p. 19-20]. Instead, Plaintiffs “direct the court’s attention to
 
 Wal-don v. Housing Authority of Paducah,
 
 854 S.W.2d 777 (Ky.App.1991), a Kentucky decision that considers whether an intervening criminal homicide supersedes the original negligent actor’s liability.” [dkt.# 68, p. 20], In
 
 Waldon,
 
 a tenant in a public housing project was shot and killed outside her apartment.
 
 See id.
 
 at 778. The Housing Authority was sued on the grounds that its negligence caused the victim’s death because it knew that threats had been made against the victim but did nothing to prevent the shooting.
 
 See id.
 
 The Housing Authority moved for summary judgment and argued that the intervening criminal act superseded its liability.
 
 See id.
 
 The trial court granted summary judgment, but on appeal, the appellate court rejected the argument and held that “[e]ven an intervening criminal act does not relieve one for liability for his or her negligent acts or omissions, where the criminal act is a reasonably foreseeable consequence of the defendant’s negligent act.”
 
 Id.
 
 at 779. Thus, according to Plaintiffs, “[i]f Car-neal’s criminal acts were a reasonably foreseeable consequence of Defendants’ negligent production and distribution of violent, pornographic products, the proximate cause of the Plaintiffs’ daughters’ murders is ‘[cjlearly a jury question.’ ” [dkt.# 68, p. 22],
 

 Plaintiffs argue that the holding of
 
 Wal-don
 
 is “dispositive in this action.” The Court does not agree. Actually, the appellate court reversed summary judgment in
 
 Waldon
 
 because there were issues of fact as to whether the Housing Authority should have realized that its acts or omissions involved an unreasonable risk of harm to the tenant: 1) the Housing Authority knew that the shooter, a man named Williams, had repeatedly threatened to kill the victim; 2) the Housing Authority knew that Williams was staying in the apartment complex with his relatives without permission; 3) the Housing Authority took no action to evict Williams or discourage his presence in the area; and 4) there were no security guards to patrol the complex even though crimes frequently occurred there.
 
 See id.
 
 Because of the existence of these factors, the appellate court concluded that there was a jury question on the issue of proximate cause due to the foreseeability of criminal conduct.
 
 See id.
 
 The appellate court reasoned that since the intervening criminal act was foreseeable to the Housing Authority, the shooting could not be deemed a superseding cause which would relieve the Housing Authority of liability. Contrary to Plaintiffs’ argument, the
 
 Waldon
 
 analysis is inapposite to this case because here, Michael Carneal’s intervening crimi
 
 *808
 
 nal acts were not foreseeable to the Defendants.
 

 To help courts make the superseding cause determination, the Kentucky Court of Appeals reviewed existing case law on the subject and articulated that a superseding cause possesses the following attributes:
 

 1) an act or event that intervenes between the original act and the injury; 2) the intervening act or event must be of independent origin, unassociated with the original act; 3) the intervening act or event must, itself, be capable of bringing about the injury; 4) the intervening act or event must not have been reasonably foreseeable by the original actor; 5) the intervening act or event involves the unforeseen negligence of a third party [one other than the first party actor or the second party plaintiff] or the intervention of a natural force; 6) the original act must, in itself, be a substantial factor in causing the injury, not a remote cause. The original act must not merely create a negligent condition or occasion; the distinction between a legal cause and a mere condition being foreseeability of injury.
 

 NKC Hospitals, Inc. v. Anthony,
 
 849 S.W.2d 564 (Ky.Ct.App.1993). Assuming Plaintiffs established that the original act of negligently designing, manufacturing, and distributing was a substantial factor in causing Plaintiffs’ injuries, the superseding cause doctrine would arise and break the chain of causation: 1) Michael Carneal’s shooting spree intervened between the original act of negligently disseminating the materials and the decedents’ deaths; 2) the shooting spree was of independent origin; 3) the shooting spree was capable of bringing about the deaths; 4) Michael Carneal’s shooting spree was not reasonably foreseeable to Defendants; and 5) the shooting spree involved the unforeseen conduct of a third party, Michael Carneal.
 

 The acts of Michael Carneal in murdering his classmates were so “highly extraordinary in nature” and “unforeseeable in character,” that they operate to “relieve [Defendants] of liability to [Plaintiffs].”
 
 See Montgomery Elevator,
 
 676 S.W.2d at 780. Just as Johnny Burnett’s suicide was not a “normal response” to TSR disseminating the game Dungeons and Dragons in the
 
 Watters
 
 case, neither was Michael Car-neal’s shooting spree a “normal response” to Defendants disseminating their movie, games and website materials in this case. Pursuant to the superseding cause doctrine, the Defendants in this matter can be no more liable for the decedents’ unforeseeable deaths than was the Dungeons & Dragons manufacturer liable for Johnny Burnett’s unforeseeable suicide in
 
 Watters.
 

 Plaintiffs argue that “[i]f this Court elects to entertain Defendants’ assertion of the superseding cause defense, ... the argument must still be denied because it has been abrogated by the pure comparative fault doctrine adopted by the Kentucky Supreme Court.” [dkt.# 68, p. 23]. Plaintiffs state othat, “[w]hen an original actor’s negligence and an intervening actor’s negligence both play a role in causing the Plaintiffs’ injuries, ‘the comparative fault doctrine demands that fault and thus damages be apportioned among the tort-feasors.’ ”[dkt.# 68, p. 25 ]. Thus, according to Plaintiffs, “a common law doctrine like superseding cause that forgives the liability of a negligent actor is ‘manifestly contradictory’ to the purposes of the comparative negligence system.”
 
 [see id.].
 
 Contrary to Plaintiffs’ argument, the United States Supreme Court has held that the superseding cause doctrine is not inconsistent with the comparative fault doctrine.
 
 See Exxon Co., U.S.A. v. Sofec, Inc.,
 
 517 U.S. 830, 837-38, 116 S.Ct. 1813, 135 L.Ed.2d 113 (1986). Under the superseding cause doctrine, the intervening actor becomes solely responsible for injuries whereas under the comparative fault doctrine, fault is apportioned among all tort-feasors. In essence, the superseding cause eliminates the original actor’s negligence as a cause of the injuries and absolves him of liability. The district court
 
 *809
 
 in
 
 Carlotta v. Warner
 
 aptly explained, “[t]he doctrine of comparative negligence does not mean that plaintiff is entitled to a recovery in some amount in every situation in which he can show some negligence of the defendant, however slight. If the plaintiff fails to establish that defendant’s negligent act or omission was a substantial factor in causing harm to the plaintiff, or if there was a superseding cause, defendant will not be liable in any amount.” 601 F.Supp. 749, 751 (E.D.Ky.1985).
 

 Despite Plaintiffs’ arguments to the contrary, the superseding cause doctrine is applicable in this matter. Michael Car-neal’s actions constitute an unforeseeable intervening act which possess all the attributes of a superseding cause as set forth by the Kentucky Court of Appeals in
 
 NEC Hospitals.
 
 In addition, his actions comply with the Restatement Second of Torts’ approach to the superseding cause doctrine, which has been adopted in Kentucky: the actions were “highly extraordinary” in nature; “unforeseeable in character;” and were not a “normal response” to the original tortious act. Therefore, as a matter of law, Michael Carneal’s actions were a superseding cause which broke the chain of causation and absolved the Defendants of liability. Alternatively, Plaintiffs’ negligence claims would be dismissed for this reason.
 

 Plaintiffs’ Cause of Action for Strict Liability
 

 Plaintiffs allege claims for strict liability due to the alleged inherent dangerousness of the products in question. Pursuant to the Restatement Second of Torts § 402A, “[olne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property.” Claims brought under this theory shift the focus “from the conduct of the actor, which is the problem in negligence cases, to the condition of the product.”
 
 Montgomery Elevator Co. v. McCullough,
 
 676 S.W.2d 776 (Ky.1984). Plaintiffs claim the games, movie, and internet materials were made and distributed “in a defective and unreasonably dangerous condition” because of their content and lack of warnings.
 

 Kentucky courts have stated that the underlying purpose of the strict liability doctrine is to allow an injured party to reach back to the manufacturer or distributor of a product following some form of failure on the product’s part.
 
 Worldwide Equipment, Inc. v. Mullins,
 
 11 S.W.3d 50 (Ky.Ct.App.1999). Thus, the very essence of the strict liability doctrine is that the use of a product caused an injury. Here, however, the actual use of the products in question,
 
 i.e.,
 
 video games, a movie, and website materials did not cause any injury. No one was injured
 
 while
 
 Michael Carneal was actually playing the video games or watching
 
 The Basketball Diaries
 
 movie or while he was viewing website materials. Rather, Plaintiffs contend that their daughters’ deaths were caused by the way Michael Carneal interpreted and reacted to the subliminal messages contained in the products. Therefore, it is not the tangible physical characteristics of the products that Plaintiffs claim make the products defective, but instead the intangible thoughts, ideas and messages contained within the products. And, it is these subliminal messages about which Plaintiff's claim Defendants had a duty
 
 to
 
 warn the public.
 

 The common theme in Defendants’ Motions to Dismiss these claims is that thoughts, ideas, and expressive content are not products. Although Kentucky has adopted the theory of strict liability presented in the Restatement Second of Torts and has enacted the Kentucky Products Liability Act, neither the Restatement Second nor Kentucky’s Product Liability Act provides a definition for “product.”
 
 See Dealers Transport Co. v. Battery Dist. Co.,
 
 402 S.W.2d 441 (Ky.1965); K.R.S. § 411.300. As an initial matter, the Court must determine as a matter of law whether thoughts, ideas, and messages contained
 
 *810
 
 in a movie, video game, or website material constitute a “product” for purposes of strict products liability.
 
 See e.g., Bryant v. Tri-County Elec. Membership Corp.,
 
 844 F.Supp. 847, 358 (W.D.Ky.1994)(stating that the determination of a “product” is a question of law).
 

 1).
 
 Are Thoughts, Ideas, and Subliminal Messages
 
 “Products”
 
 Within the Ambit of the Strict Liability Doctrine?
 

 Plaintiffs argue that “intangibles” are products and “subject to strict liability [when] the ‘intangibles’ are sold to and consumed by the public.” [dkt.# 68, p. 29]. In support of their argument, Plaintiffs cite
 
 Comshare Incorporated v. United States,
 
 27 F.3d 1142 (6th Cir.1994). There, a computer software company sued the government to obtain an income tax refund because the company had spent millions of dollars purchasing computer program source codes but had not been given the “tangible property” investment tax credit.
 
 See id.
 
 The Sixth Circuit held that Comshare was entitled to the “tangible property” tax credit because “the intangible information on Comshare’s master source code tapes and discs could not exist in usable form without the tangible medium.”
 
 Id.
 
 at 1149.
 

 In addition, Plaintiffs cite a commercial transactions case,
 
 Advent Systems Limited v. Unisys Corporation,
 
 925 F.2d 670 (3d Cir.1991). In
 
 Advent Systems,
 
 the Third Circuit held that once a computer program is downloaded onto a diskette, it becomes a “good” under the Uniform Commercial Code.
 
 See
 
 925 F.2d at 675. Contrary to Plaintiffs’ analysis, these holdings are in-apposite because they do not discuss strict liability theories and are unrelated to products liability law. While computer source codes and programs are construed as “tangible property” for tax purposes and as “goods” for UCC purposes, these classifications do not indicate that intangible thoughts, ideas, and messages contained in computer video games, movies, or internet materials should be treated as products for purposes of strict liability.
 

 Plaintiffs also cite a products liability case,
 
 Bryant v. Tri-County Electric Membership Corporation,
 
 844 F.Supp. 347 (W.D.Ky.1994). In
 
 Bryant,
 
 the corut held that electricity was a product for purposes of strict liability because it was “created, harnessed, measured, transported, bought and sold, like products generally.” 844 F.Supp. at 352. Again, contrary to Plaintiffs’ analysis, this holding is distinguishable because in that case, the physical properties of electricity caused the harm. Here, Plaintiffs base their strict liability claims on the intangible characteristics of the products, rather than on their physical properties.
 

 The Sixth Circuit has stated that “[w]here the state supreme court has not spoken, [the district court’s] task is to discern, from all available sources, how that court would respond if confronted with the issue.”
 
 See Miles v. Kohli & Kaliher
 
 Assocs., 917 F.2d 235, 241 (6th Cir.1990). While there is no Kentucky case law on point, there is authority from the Sixth Circuit rejecting similar state law claims when reasoning “[t]he governing principles seem clear enough.”
 
 Watters,
 
 904 F.2d at 380. In
 
 Watters,
 
 the Sixth Circuit reviewed existing precedents and concluded, “[a]s far as we have been able to ascertain, ... the doctrine of strict liability has never been extended to words or pictures. Other courts have looked in vain for decision so expanding the scope of the strict liability doctrine.”
 
 Id.
 
 at 381. Inherent in this statement is the rationale that intangible thoughts, ideas, and messages contained within games, movies, and website materials are not products for purposes of strict products liability.
 

 Counsel for the Plaintiffs fail to appreciate the critical distinction between intangible properties, such as those which caused harm to Plaintiffs, and tangible properties for which strict liability can be imposed. The Ninth Circuit explained this distinc
 
 *811
 
 tion in
 
 Winter v. G.P. Putnam’s Sons
 
 by stating:
 

 A book containing Shakespeare’s sonnets consists of two parts, the material and the print therein, and the ideas and expression thereof. The first may be a product, but the second is not. The latter, were Shakespeare alive, would be governed by copyright laws; the laws of libel to the extent consistent with the First Amendment; and the laws of misrepresentation, negligent misrepresentation, negligence, and mistake. These doctrines applicable to the second part are aimed at the delicate issues that arise with respect to intangibles such as ideas and expression. Products liability law is geared to the tangible world.
 

 938 F.2d 1033, 1034 (9th Cir.1991). This reasoning is further supported by the Restatement Third of Torts. Although Kentucky courts have yet to adopt the Restatement Third of Torts, the Court predicts that the Kentucky Supreme Court, as it has always done in the past, will eventually adopt the newer edition of the Restatement of Torts. There, the word “product” is defined and a distinction is made between tangible and intangible properties. Moreover, the commentary for § 19(a) of the Restatement Third notes that courts “have, appropriately refused to impose strict product liability” in cases where the plaintiffs grievances were “with the information, not with the tangible medium.”
 
 Id.
 
 at cmt.d.
 

 Pursuant to the teachings of the Sixth Circuit’s opinion in
 
 Watters,
 
 which is now further supported by the analysis found in the Restatement Third of Torts, the Court finds as a matter of law that intangible thoughts, ideas, and expressive content are not “products” within the realm of the strict liability doctrine.
 

 2).
 
 Causation
 

 Assuming
 
 arguendo
 
 that the doctrine of strict liability could be extended to include the thoughts, ideas, and messages contained in video games, movies, and website materials, Plaintiffs nevertheless would have to establish causation in order to state a claim based on strict liability theories.
 
 See Morales v. American Honda, Motor Co., Inc.,
 
 71 F.3d 531, 537 (6th Cir.1995). As was previously discussed, causation may be defeated by an intervening act that constitutes a superseding cause. The Court has already determined as a matter of law that Michael Carneal’s actions constituted a superseding cause which broke the chain of causation. Therefore, in the alternative, Plaintiffs’ strict liability claims would fail for lack of causation.
 

 Plaintiffs’ Cause of Action for RICO Violations'
 

 Plaintiffs allege in count four of their complaint that the Internet Defendants violated federal RICO statutes. Specifically, Plaintiffs state that:
 

 The Internet Defendants engaged in a pattern of racketeering activity by distributing certain obscene matter by means of the Internet through interstate commerce to Michael Carneal, a minor, in violation of state and federal obscenity and obscenity to minor statutes. This distribution of contraband material by the Internet Defendants violates 18 U.S.C. § 1961
 
 et seq.
 
 Plaintiffs are “injured parties” under the federal RICO statute and as such are entitled to treble damages against the “Internet Defendants” [dkt.# 1].
 

 The Sixth Circuit has described the federal RICO Act as being “designed to give prosecutors an additional weapon against organized crime and to help protect legitimate businesses from infiltration by racketeers.”
 
 See Drake v. B.F.Goodrich Co.,
 
 782 F.2d 638, 644 (6th Cir.1986) (citations omitted). Congress included a civil remedies provision in the Act to authorize recovery for injury to a person’s business or property.
 
 See
 
 18 U.S.C. § 1964(c). By including a civil remedy, Congress intended to allow those who were “injured by the infiltration of organized crime into the le
 
 *812
 
 gitimate business arena” to recover damages. Parties are attracted to the civil RICO statute because any amount of damages a jury awards is then tripled under the statute and recovery for both costs and attorneys’ fees are allowed.
 
 See
 
 18 U.S.C. § 1964(c). However, because the RICO civil remedies provision authorizes recovery only for certain types of claims and injuries, not every plaintiff asserting a RICO claim will have standing to bring the claim. As an initial matter, the Court must determine whether Plaintiffs have standing to assert their RICO cause of action.
 

 Standing to Bring a Civil RICO Action .
 

 The RICO civil remedy provision provides that: “[a]ny person injured in his business or property by reason of a violation of section 1962 of this Chapter may sue therefore in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney’s fee.”
 
 See
 
 18 U.S.C. § 1964(c). In order to have standing to assert a civil RICO claim, a plaintiff must properly plead three elements: 1) that a violation of § 1962 has occurred; 2) that he has suffered an injury to his “business or property;” and 3) that his injury was proximately caused by the violation of § 1962.
 
 See
 
 18 U.S.C. § 1964(c);
 
 Sedima, S.P.R.L. v. Im-rex Co.,
 
 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).
 

 The First Element of A Civil RICO Claim
 
 — A
 
 Violation of § 1962
 

 To demonstrate the first element of a civil RICO claim, that a violation of § 1962 has occurred, a plaintiff must allege that § 1962 was violated by a petson associated with an enterprise, the actions of which affected commerce and were related to a pattern of racketeering activity.
 
 See
 
 18 U.S.C. § 1962(a)-(d). Plaintiffs state in their complaint that the Internet Defendants “engaged in a pattern of racketeering activity by distributing certain obscene matter by means of the Internet through interstate commerce[,] ... [that] [t]his distribution of contraband of material by the Internet Defendants violates 18 U.S.C. § 1961
 
 et seq.
 
 [and that] Plaintiffs are ‘injured parties’ under the federal RICO statute.” [dkt.# 1], The statement that Defendants distributed obscene materials in violation of state and federal obscenity laws only serves as the predicate act of racketeering upon which to base a § 1962 violation. The predicate act itself is insufficient to establish that § 1962 was violated. Instead, a plaintiff is required to plead facts demonstrating a violation of § 1962. Here, Plaintiffs merely state that “18 U.S.C. § 1961
 
 et seq.”
 
 was violated. Plaintiffs’ use of the inclusive language
 
 “et seq.,”
 
 is insufficient to satisfy the requirement that a plaintiff must allege a violation of § 1962 for several reasons.
 

 First, as Plaintiffs’ complaint omits a specific reference to § 1962, it fails to inform Defendants as to which subsection of § 1962 they are charged with violating. Section 1962 prohibits various types of activity and provides different theories upon which to base a claim. For example: § 1962(a) prohibits a person from investing illegally gotten proceeds in an enterprise; § 1962(b) prohibits a person from using racketeering activity to acquire control or interest in an enterprise; § 1962(c) prohibits a person from conducting an enterprise through the use of a pattern of racketeering activity; and § 1962(d) prohibits any person from conspiring with another to violate subsections (a), (b), or (c). As such, it is essential that a plaintiff specify upon which subsection of § 1962 his cause of action is predicated.
 

 Second, Plaintiffs’ failure to make a specific reference to § 1962 makes it difficult to discern for the purposes of the motion to dismiss whether they have stated a claim upon which relief can be granted. The elements of each subsection are different so it is important that the complaint set forth each essential element in order to properly state a claim. With the spirit of accepting liberal pleadings, the Court will
 
 *813
 
 attempt to glean from the pleadings under which subsection of § 1962 Plaintiffs bring their claim. Plaintiffs have not alleged that Defendants invested illegal proceeds, attempted to acquire control of an enterprise, or engaged in any type of conspiracy, therefore the only applicable subsection found in § 1962 would be subsection (c) which prohibits a person from conducting an enterprise through the use of racketeering activity. To state a cause of action pursuant to § 1962(c), a plaintiff must allege: 1) conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity.
 
 See
 
 18 U.S.C. § 1962(c);
 
 Sedima, 473
 
 U.S. at 496, 105 S.Ct. 3275.
 

 An enterprise is defined as “any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity.”
 
 See
 
 18 U.S.C. § 1961(4). The Supreme Court has stated that an enterprise is an entity, or a group of persons associated for a common purpose of engaging in a course of conduct.
 
 See United States v. Turkette,
 
 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The “enterprise” is not to be confused with the “pattern of racketeering activity.”
 
 See id.
 
 Rather, it is an entity apart and distinct from the pattern of activity in which it engages.
 
 See id.
 
 Put simply, the enterprise is the “vehicle” through which a person conducts the racketeering activity. The existence of an enterprise is a separate element which must be alleged in order to show that a violation of § 1962 has occurred and that the first element of a civil RICO claim has been established.
 
 See id.
 
 at
 
 583,
 
 101 S.Ct. 2524. Plaintiffs’ complaint fails altogether to even mention the word “enterprise,” let alone allege that Defendants belonged to or associated with an enterprise.
 

 Again, with the spirit of accepting liberal pleadings the Court will attempt to glean from the pleadings the existence of any allegations which could be interpreted as constituting an enterprise and thereby “saving” Plaintiffs’ claims. By definition, the companies named as the Internet Defendants would qualify as an enterprise since these companies could be used as a vehicle to conduct racketeering activity such as distributing obscene materials to minors. The fundamental flaw with this interpretation of the pleadings is that if the Court accepts that Plaintiffs intended for the named companies to be the enterprise, then the named companies cannot also be the named RICO defendants. It is well-established among the majority of appellate circuits that a corporation cannot serve dual roles as both the RICO defendant and the enterprise in a plaintiffs complaint.
 
 See e.g., Libertad v. Welch,
 
 53 F.3d 428, 441 (1st Cir.1995)(stating that the “RICO enterprise cannot be named as the RICO defendant”);
 
 Bennett v. U.S. Trust Co. of New York,
 
 770 F.2d 308 (2d Cir.1985)(holding that under section 1962(c), “a corporate entity may not be simultaneously the ‘enterprise’ and the ‘person’ who conducts ... the racketeering activity”),
 
 cert. denied,,
 
 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986);
 
 B.F. Hirsch v. Enright Refining Co.,
 
 751 F.2d 628, 634 (3d Cir.1984)(stating, “a violation of section 1962(c) by a corporate entity requires an association with an enterprise that is not the same corporation”);
 
 Haroco, Inc. v. American National Bank & Trust Co.,
 
 747 F.2d 384, 400 (7th Cir,1984)(stating, “section 1962(c) requires separate entities as the liable person and the enterprise”),
 
 aff'd on other grounds,
 
 473 U.S. 479, 105 S.Ct. 3292, 87 L.Ed.2d 346 (1985)(per curiam);
 
 Rae v. Union Bank,
 
 725 F.2d 478, 481 (9th Cir.1984) (stating “if Union Bank is the enterprise, it cannot also be the RICO defendant”);
 
 United States v. Computer Sciences Corp.,
 
 689 F.2d 1181, 1190 (4th Cir.1982)(“ ‘enterprise’ was meant to refer to a being different from ... the person whose behavior the act was designed to prohibit”),
 
 cert. 0denied, 459 U.S. 1105, 103 S.Ct. 729, 74
 
 L.Ed.2d 953 (1983);
 
 Bennett v. Berg,
 
 685 F.2d 1053, 1061 (8th Cir.l982)(“defendant may not be both enterprise and person associated with enterprise”).
 

 
 *814
 
 Plaintiffs’ failure to allege the existence of an enterprise alone is fatal to establishing the first element of their RICO claim, that a violation of section 1962(c) has occurred.
 
 See e.g., Advocacy Organization for Patients & Providers v. Auto Club Ins. Assoc.,
 
 176 F.3d 315, 330 (6th Cir.1999)(affirming dismissal of RICO claim for, among other reasons, failure to sufficiently allege enterprise),
 
 cert. denied,
 
 - U.S. -, 120 S.Ct. 172, 145 L.Ed.2d 145 (1999). Assuming that Plaintiffs had sufficiently pleaded facts demonstrating the existence of an enterprise, Plaintiffs would then be required to demonstrate that Defendants used the enterprise to conduct their “pattern of racketeering activity.”
 

 In the complaint, Plaintiffs simply state that the Internet Defendants engaged in conduct constituting “a pattern of racketeering activity.” This statement is insufficient as a plaintiff is required to allege facts which would establish that the defendant’s “pattern of racketeering activity” was related to the enterprise.
 
 See United States v. Qaoud, 777
 
 F.2d 1105, 1115 (6th Cir.1985)(stating that “[t]o establish that an enterprise’s affairs have been conducted “through” a pattern of racketeering activity, there must be a nexus between the enterprise and the racketeering activity”) (citations omitted). Again, Plaintiffs’ complaint fails to allege the existence of an enterprise let alone plead facts establishing that Defendants used an enterprise to conduct a pattern of racketeering activity. Plaintiffs’ RICO claim must be dismissed for failure to state a claim upon which relief can be granted.
 

 As the Court has determined that Plaintiffs’ RICO cause of action must be dismissed due to Plaintiffs’ failure to allege the first essential element of the claim, normally there would be no need to address the remaining elements of the claim. However, as Plaintiffs’ omissions could be cured by amending their complaint, the Court will proceed to analyze the remaining elements of their RICO claim in order to demonstrate why the claim would fail regardless of the technical pleading omissions.
 

 The Second Element of a Civil RICO Claim
 
 — Injury
 
 to Business or Property
 

 Assuming
 
 arguendo
 
 that Plaintiffs had properly alleged that § 1962 was violated by a person associated with an enterprise, Plaintiffs would then be required to demonstrate the second element of their claim: that they suffered an injury to “business or property” as a result of the RICO violation. Personal injuries and mental suffering do not confer a person with standing to bring a RICO claim because those types of damages are not injuries to “business or property.”
 
 See Fleischhauer v. Feltner,
 
 879 F.2d 1290, 1300 (6th Cir.1989),
 
 cert. denied,
 
 493 U.S. 1074, 110 S.Ct. 1122, 107 L.Ed.2d 1029 (1990).
 

 In an attempt to satisfy the requirement that they be injured in their business or property, Plaintiffs argue that their deceased daughters’ loss of earning capacity constitutes an injury to property. The Sixth Circuit has stated that “ ‘injury to property’ for RICO purposes is generally determined by state law.”
 
 Isaak v. Trumbull Savings & Loan Co.,
 
 169 F.3d 390, 397 (6th Cir.1999). Plaintiffs argue that under Kentucky law, earning capacity constitutes an interest in property. As support for this proposition, Plaintiffs cite
 
 Inman v. Inman,
 
 578 S.W.2d 266 (Ky.Ct. App.1979), as “recognizpng] that individuals hold a property interest in earning capacity.” [dkt.# 1]. There, the Kentucky Court of Appeals considered whether a professional license that enhanced a spouse’s earning capacity should be placed in the category of “marital property” for the purposes of distributing marital assets following a divorce.
 
 See id.
 
 at 267. The
 
 Inman
 
 court stated that it had “strong reservations about placing a professional license in the category of marital property” but recognized that there were inequitable situations such as where one spouse puts another through graduate or profes
 
 *815
 
 sional school only then to be faced with a divorce and no maintenance payments.
 
 See id.
 
 In such situations, the
 
 Inman
 
 court reasoned that “treating a professional license as marital property is the only way in which a court can achieve an equitable result.”
 
 See id.
 
 at 268. In arriving at this decision though, the
 
 Inman
 
 court explicitly stated that it “wish[ed] to place very strict limitations on apportionment of property pursuant to such findings.”
 
 See id.
 
 at 269. The case was then remanded for the circuit court to determine what interest the spouse had in her husband’s license to practice dentistry.
 
 See 'id.
 
 at 270. The circuit court made its findings and the husband appealed the court’s decision. When the case went up on appeal for a second time, the Court of Appeals reversed its prior determination. The Kentucky Supreme Court then granted review to decide the applicability of the “law-of-the-case doctrine” which mandates that an appellate court on a subsequent appeal be bound by its decision on the former appeal. When reviewing the underlying matter, the Kentucky Supreme Court analyzed case law from other states, all of which rejected the notion that a professional license is marital property, and concluded, “[t]his court cannot accept the proposition that an educational degree ... is ... marital property.”
 
 See Inman v. Inman,
 
 648 S.W.2d 847 (Ky. 1982). Contrary to Plaintiffs’ anaiysis, not only is the Court of Appeals’ opinion in
 
 Inman
 
 regarding marital property totally inapposite to the determination of whether a deceased child’s loss of earning capacity constitutes a property interest, but the rationale contained therein has since been rejected both by the appellate court that wrote the opinion and by the Kentucky Supreme Court.
 
 See Inman,
 
 648 S.W.2d at 848.
 

 Plaintiffs attempt to persuade the Court that the line between “injury to property” and pecuniary losses resulting from personal injuries is blurred. However, Plaintiffs have offered no other cases to support their proposition that under Kentucky law, earning capacity constitutes an interest m property. Instead of providing any other Kentucky case law, Plaintiffs make a citation reference to a Colorado case,
 
 In re Marriage of Graham,
 
 194 Colo. 429, 574 P.2d 75 (1978), which was discussed in the
 
 Inman
 
 opinion. In doing so, Plaintiffs place emphasis on a quoted passage from the Colorado case as stating “[cjlassification of earning capacity as property is not ... farfetched.... a court, in defining the statutory concept ... is in distinguished company when it refuses to be hamstrung by narrow definitions of ‘property.’ ” Again, contrary to Plaintiffs’ analysis, an examination of the full text of this passage reveals two fundamental flaws with any reliance thereon: 1) Plaintiffs’ quoted passage is found in the dissenting opinion of the case rather than in its main text; and 2) the case holding rejects the notion that a professional license that enhances earning capacity should be considered marital property. Thus, although Plaintiffs may attempt to persuade this Court “that it would be in distinguished company if it refused to be hamstrung by narrow definitions of ‘property,’ ” there is no authority to support Plaintiffs’ proposition that under Kentucky law, earning capacity is construed as an interest in “property.” Under traditional concepts of “property,” the RICO claim cannot proceed because Plaintiffs cannot demonstrate an “injury to property.”
 

 Despite the absence of Kentucky case law supporting their proposition, Plaintiffs argue that “RICO applies to injuries asserted in this action, namely the destruction of the children’s property rights to their future earnings.” The Seventh Circuit, when confronted with a claimant trying to bring a civil RICO claim for loss of earnings stemming from personal injuries noted, “[pjerhaps the economic aspects of such injuries could, as a theoretical matter, be viewed as injuries to ‘business or property,’ but engaging in such metaphysical speculation is a task best left to philosophers, not the federal judiciary.”
 
 *816
 

 See Doe v. Roe,
 
 958 F.2d 763, 768 (7th Cir.1992). Here, even if the Court undertook some philosophical approach and construed earning capacity as a property right, the Court nevertheless would be unable to adopt such an interpretation because it would contravene Congress’ intent in enacting the RICO statute.
 
 See e.g., Reconstruction Finance Corp. v. Beaver County,
 
 328 U.S. 204, 66 S.Ct. 992, 90 L.Ed. 1172 (1946).
 

 Federal courts, when interpreting Congressional intent in enacting the RICO civil remedies provision, have widely held that personal injuries and the losses resulting therefrom do not constitute “injury to property” so as to fall within the ambit of the RICO statute. For example, in
 
 Grogan v. Platt,
 
 a case on point, the Eleventh Circuit rejected claims for lost earnings and loss of support as a basis for civil RICO recovery.
 
 See
 
 835 F.2d 844 (11th Cir.),
 
 cert. denied,
 
 488 U.S. 981, 109 S.Ct. 531, 102 L.Ed.2d 562 (1988). There, the families ' of two murdered FBI agents sought recovery of their sons’ loss of earnings and loss of support under the civil remedies provision of the RICO Act.
 
 See id.
 
 Instead of focusing on whether economic damages such as lost earnings constituted an injury to property under the RICO statute, the Eleventh Circuit reasoned that the proper inquiry was “whether Congress intended the damages that plaintiffs seek in this case to be recoverable under civil RICO.”
 
 Id.
 
 at 846. In deciding the issue, the Eleventh Circuit “[relied] on the assumption that Congress intends the ordinary meanings of the words it employs,” and stated, “[i]n our view, the ordinary meaning of the phrase ‘injured in his business or property’ excludes personal injuries, including the pecuniary losses therefrom.”
 
 Id.
 
 at 847. The Eleventh Circuit reasoned that the families of the murdered FBI agents were seeking a recovery that Congress had not designed RICO to afford. The Eleventh Circuit held that the families could not recover lost earnings and loss of support damages under RICO because “those pecuniary losses ... are most properly understood as part of a personal injury claim” and not as a claim for injury to business or property.
 
 See id.
 
 at 848.
 

 In
 
 Drake v. B.F. Goodrich Company,
 
 the Sixth Circuit espoused similar reasoning. See 782 F.2d 638 (6th Cir.1986). In
 
 Drake,
 
 the survivors of deceased workers who were exposed to toxic substances argued they should be allowed to bring a RICO claim to recover the decedents’ lost wages.
 
 See id.
 
 The district court refused to allow the survivors to file the claim so they appealed the district court’s decision. On appeal, the Sixth Circuit rejected the argument that pecuniary injuries derived from personal injuries confers a party with standing to assert a RICO claim. In doing so, the Sixth Circuit specifically acknowledged that “[t]he phrase ‘business or property’ ‘... retains restrictive significance” which prevents such claims.
 
 See id.
 
 at 643-44. Other circuits have also refused to allow a plaintiff to assert a RICO claim based on pecuniary losses which are derived from personal injuries.
 
 See e.g., Bast v. Cohen, Dunn & Sinclair, P.C.,
 
 59 F.3d 492 (4th Cir.1995);
 
 Doe v. Roe,
 
 958 F.2d 763, 770 (7th Cir.1992);
 
 Oscar v. University Students Co-operative Ass’n,
 
 965 F.2d 783 (9th Cir.1992)(holding that “a showing of ‘injury1 requires proof of concrete financial loss, and not mere ‘injury to valuable intangible property interest’ ... [and that] personal injuries are not compensable under RICO”).
 

 The common rationale underlying these opinions is that pecuniary losses associated with personal injuries are not recoverable under the civil RICO provision because Congress created the civil remedies provision solely to afford relief to those injured in the legitimate business arena. It is hard to imagine that when Congress enacted civil RICO it contemplated that a child’s earning capacity would be regarded as property, the loss of which would be recoverable threefold. Losses such as those sustained by Plaintiffs are more properly
 
 *817
 
 associated with state tort claims rather than federal civil RICO claims. Plaintiffs are not seeking the kind of recovery the RICO civil remedies provision was designed to afford. The Second Circuit explained, “[t]he requirement that the injury be to the plaintiffs business or property means that the plaintiff must show a proprietary type of damage. For example, a person physically injured in a fire whose origin was arson is not given a right to recover for his personal injuries; damage to his business or his building is the type of injury for which § 1964(c) permits suit.”
 
 Bankers Trust Co. v. Rhoades,
 
 741 F.2d 511, 515 (2d Cir.1984) (dictum),
 
 vacated on other grounds,
 
 473 U.S. 922, 105 S.Ct. 3550, 87 L.Ed.2d 673 (1985). The pecuniary losses derived from the wrongful death of their children simply cannot transform Plaintiffs’ injuries into an injury to business or property. Plaintiffs are unable to establish the required “injury to property” element of their RICO claim, and without this element, Plaintiffs have no standing on which to bring their claim.
 

 Although the Court has determined that Plaintiffs’ RICO claim must be dismissed for failure to properly plead the first element of the claim and has also determined that it would fail for a lack of standing as to the second element, the Court will, at the risk of beating the proverbial dead horse, proceed to explain why Plaintiffs’ claim would also fail as to the third element.
 

 The Third Element of A Civil RICO Claim
 
 — A
 
 Violation of Section 1962 Caused Plaintiffs’ Injuries
 

 Again, assuming
 
 arguendo
 
 that Plaintiffs had established the first two elements, that section 1962 was violated by a person associated with an enterprise and that they suffered an injury to their business or property, the Court would then turn to the third element, that Plaintiffs’s injuries were caused by the violation of § 1962. To satisfy this element, a plaintiff must allege facts which would establish that his injuries were a direct result of the § 1962 violation. It is insufficient for a plaintiff to allege that he was injured by the defendant’s commission of the predicate act, in this case distributing obscene materials to minors. The Sixth Circuit’s analysis in
 
 Advocacy Organization for Patients and Providers v. Auto Club Insurance Association
 
 is illustrative of this point.
 
 See
 
 176 F.3d 315 (6th Cir.),
 
 cert. denied,
 
 — U.S. -, 120 S.Ct. 172, 145 L.Ed.2d 145 (1999). There, the Sixth Circuit affirmed the district court’s dismissal of a plaintiffs civil RICO claim brought under § 1962(b) for failure to state a claim upon which relief could be granted.
 
 See id.
 
 at 330. In explaining why a dismissal was proper, the Sixth Circuit stated:
 

 [Ajccording to 18 U.S.C. § 1964(c), plaintiff can only seek a civil remedy under RICO if her business or property was injured by reason of the § 1962(b) violation. Contrary to plaintiffs assertion, one does not violate § 1962(b) by committing mail fraud or extortion. Instead, one must use racketeering activity to gain control or interest in an enterprise. In other words, plaintiff cannot simply allege that she was injured by the underlying acts of mail fraud and extortion. Rather, she must allege that she was injured by a violation of § 1962(b). In this case, in order to be injured by a violation of § 1962(b), plaintiff must show that her alleged injuries resulted from Auto Club having maintained an interest in itself as an enterprise.
 

 Id.
 
 (quotations omitted). Applying this analysis to Plaintiffs’ allegations reveals another fatal flaw in their complaint. Plaintiffs were required to plead facts sufficiently demonstrating that their injuries resulted from Defendants’ use of an enterprise to conduct a pattern of racketeering. Plaintiffs’ complaint lacks such allegations.
 
 See Craighead v. E.F. Hutton & Co., Inc.,
 
 899 F.2d 485, 494 (6th Cir.1990)(explaining that a § 1962(a) claim must fail when a plaintiff fails to allege injuries stemming directly from the § 1962 violation).
 

 
 *818
 
 Again, assuming that Plaintiffs had properly pleaded that their injuries were a direct result of the § 1962 violation, their claim would fail on the premise that they could not establish that the § 1962 violation proximately caused their injuries. The Supreme Court has established that a “plaintiff ...
 
 can only recover to the extent that he has been injured in his business or property by the conduct constituting the violation.” Sedima,
 
 473 U.S. at 496, 105 S.Ct. 3275 (emphasis added). Moreover, the Supreme Court has explicitly stated that a plaintiffs right to sue under the civil RICO provision requires a showing that the defendant’s violation of the Act was not only a “but for” cause of the injury but was the “proximate cause” as well.
 
 See Holmes v. Securities Investor Protection Corp.,
 
 503 U.S. 258, 268-70, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992);
 
 Fleischhauer v. Feltner,
 
 879 F.2d 1290, 1300 (6th Cir.1989). Thus, assuming as true for the purposes of the motion to dismiss that the Internet Defendants violated the RICO Act as alleged in the complaint, Plaintiffs were still required to show that Defendants’ actions
 
 proximately caused
 
 their daughters’ deaths and subsequent loss of earning capacity.
 

 The Sixth Circuit has stated that “ ‘[c]ivil RICO is a statutory tort, so causation principles that generally apply in tort cases apply in civil RICO cases.’ ”
 
 Kaufman v. BDO Seidman,
 
 984 F.2d 182, 185 (6th
 
 Cir.1993)(quoting Reynolds v. East Dyer Development Co.,
 
 882 F.2d 1249, 1253 (7th Cir.1989). At this juncture, the Court’s analysis regarding the causation element becomes subsumed by the Court’s previous analysis regarding the causation elements under both negligence and strict liability theories. In short, Michael Carneal’s intervening acts served as a superseding cause which broke the required causal connection needed not only for Plaintiffs to establish negligence and strict liability but also to establish civil RICO liability. Because Plaintiffs cannot demonstrate the requisite causal connection between their “injuries” and the acts of racketeering Defendants are alleged to have committed, they have failed to establish the third element of their RICO claim. Plaintiffs’ RICO claim must be dismissed.
 
 [4]
 

 First Amendment Issues
 

 By now it is clear that this case raises various constitutional concerns. However, the Supreme Court has stated, “[w]here there is no need to decide a constitutional question, it is a venerable principle of this Court’s adjudicatory processes not to do so for ‘[t]he Court will not ‘anticipate a question of constitutional law in advance of the necessity of deciding it.’ ”
 
 Ashwander v. TVA
 
 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936). In
 
 Watters v. TSR, Incorporated,
 
 this Court decided similar claims on constitutional grounds and did not analyze the claims pursuant to Kentucky law.
 
 See
 
 715 F.Supp. 819 (W.D.Ky.1989),
 
 aff'd on other grounds,
 
 904 F.2d 378 (6th Cir.1990). On appeal, the Sixth Circuit reiterated to this Court the principle that “constitutional questions should be decided only where necessary.”
 
 See Watters,
 
 904 F.2d at 380. Although history may repeat itself, this Court has learned its lesson well. Therefore, since Kentucky law adequately resolves the issues presented in this matter, the Court will not address the constitutional issues looming in the background. Nevertheless, had the Court confronted the constitutional issues, it would have relied on its previous analysis in
 
 Watters
 
 where it explained:
 

 The theories of liability sought to be imposed upon the manufacturer of a
 
 *819
 
 role-playing fantasy game would have a devastatingly broad chilling effect on expression of all forms. It cannot be justified by the benefit Plaintiff claims would result from the imposition. The libraries of the world are a great reservoir of works of fiction and nonfiction which may stir their readers to commit heinous acts of violence or evil. However, ideas expressed in one work which may drive some people to violence or ruin, may inspire others to feats of excellence or greatness. As was stated by the second Mr. Justice Harlan, ‘one man’s vulgarity is another man’s lyric.’ Atrocities have been committed in the name of many of civilization’s great religions, intellectuals, and artists, yet the first amendment does not hold those whose ideas inspired the crimes to answer for such acts. To do so would be to allow the freaks and misfits of society to declare what the rest of the country can and cannot read, watch and hear.
 

 Id.
 
 at 822.
 

 Conclusion
 

 Under existing law, which this Court has no power to change, the Court has ruled that:
 

 1) Plaintiffs’ negligence claims must be dismissed because Defendants owed no legal duty of care since Michael Carneal’s actions were unforseeable. Alternatively, Michael Carneal’s intervening acts constituted a superseding cause which absolved Defendants of liability;
 

 2) Plaintiffs’ strict products liability claims must be dismissed because thoughts, ideas, and expressions contained within Defendants’ movie, games, and website materials do not constitute a “product” within the realm of the strict liability doctrine; and
 

 3) Plaintiffs’ RICO claims must be dismissed because Plaintiffs cannot establish essential elements needed to support a civil RICO Act recovery.
 

 This was a tragic situation, but as the Sixth Circuit stated in
 
 Watters,
 
 “[tjrage-dies such as this simply defy rational explanation, and courts should not pretend otherwise.” 904 F.2d at 384.
 

 An order dismissing this case in its entirety will be entered.
 

 [1]
 

 . Plaintiffs name Time Warner, Palm Pictures, Island Pictures, New Line Cinema, and Polygram as Defendants in the complaint [hereinafter referred to as the
 
 Diaries
 
 Defendants].
 

 [2]
 

 . Plaintiffs name Midway Home Entertainment, Apogee Software, Inc., ID Software, Inc., Virtus Corporation, Acclaim Entertainment, Inc., Atari Corporation, GT Interactive Software Corporation, Interplay Productions, Inc., Nintendo of America, Sega of America, Inc.., Virgin Interactive Media, Activision, Inc., Capcom Entertainment, Inc., EIDOS Interactive, Williams Entertainment, Inc., Square Soft, Inc. d/b/a Square USA Inc. and Sony Computer Entertainment d/b/a Sony Interactive Studios America as Defendants in the complaint [hereinafter referred to as the Video Game Defendants]. Plaintiffs later voluntarily dismissed Defendants Virtus Corporation, EIDOS Interactive, Square Soft, and Atari Corporation. [See dkl.# 34, 41, 44 & 45].
 

 [3]
 

 . Plaintiffs name Meow Media, Inc. d/b/a
 
 www.persiankitty.com
 
 and Network Authentication Systems, Inc. d/b/a
 
 www.adultlcey.com
 
 and
 
 www.pom.1ech.com
 
 as Defendants in the
 
 complaint
 
 [hereinafter referred
 
 to as
 
 the Internet Defendants].
 

 [4]
 

 . Moreover, even if Plaintiffs had properly alleged and established the requisite elements to assert their RICO claim, it would be subject to dismissal for independent and sufficient grounds such as: 1) the failure to state which internet websites Michael Carneal visited, what type of "materials” were distributed, and how the distribution of such "materials” violated federal and state decency laws; and 2) Defendants’ various affirmative defenses such as statutory compliance.