Diane BAILEY, Plaintiff–Appellee,

v.

HUGGINS DIAGNOSTIC & REHABILITATION CENTER, INC. and Hal A. Huggins, D.D.S., Defendants–Appellants,

and

Gino Ortegon, D.D.S., Defendant.

No. 96CA0586.

Colorado Court of Appeals, Div. I.

June 26, 1997.

Rehearing Denied July 31, 1997.

Certiorari Denied Feb. 23, 1998.

Wills & Adams, LLP, Derry Beach Adams, Colorado Springs, for Plaintiff–Appellee.

James L. Merrill, Attorneys at Law, James L. Merrill, Stephen D. Harris, Colorado Springs, for Defendants–Appellants.

Opinion by Judge CRISWELL.

Plaintiff, Diane Bailey, instituted this action against defendants, Gino Ortegon, D.D.S., and Hal A. Huggins, D.D.S., both of whom were employed by defendant Huggins Diagnostic and Rehabilitation Center, Inc. (Center) in which Huggins is the sole stockholder. She sought to recover damages allegedly resulting to her from Ortegon's dental malpractice, damages against Huggins for his alleged negligent misrepresentation, and a judgment against the Center, based on the actions of both, under the doctrine of *respondeat superior*. After a trial, a jury returned verdicts in favor of plaintiff for actual and exemplary damages against Ortegon and the Center, based on his malpractice, and for actual and exemplary damages against Huggins and the Center, based on his alleged negligent misrepresentation. Neither Ortegon nor the Center appeals from the resulting judgment based upon Ortegon's malpractice; both Huggins and the Center appeal from the resulting judgment based on Huggins' alleged misrepresentation. We reverse.

Plaintiff's claim against Huggins for negligent misrepresentation arises from Huggins' vigorous participation in an on-going debate over the question whether the use of dental amalgams can have a deleterious effect upon a patient's general health. The evidence establishes that amalgams are used to fill cavities in teeth and for other dental purposes. They are a mixture of silver, mercury, and other substances, and everyone now concedes that, after placement in a patient's mouth, the mercury and other metals emit vapors which are absorbed by various portions of the body. The debate centers on whether these emissions are in such quantities as to constitute a health hazard.

The vast majority of dentists are adamant in insisting that the use of amalgams is completely safe. Huggins and a very small minority of dentists are equally insistent that the vapors emitted by the amalgams can result in muscular deficiencies, causing the patient to exhibit symptoms similar to muscular dystrophy, as well as other maladies. Huggins has publicly recommended that amalgams be removed, at least in some patients, and replaced with other materials.

In January 1993, the United States Department of Health and Human Services, based on a previous study, issued a report upon the issue, which was placed in evidence at trial. That report concluded that some portion of the mercury in an amalgam is absorbed by the body and that persons with dental amalgam "had higher concentrations of mercury in various tissues ... than those without amalgam." In addition, it concluded that "a small proportion of individuals may manifest allergic reactions" to these substances. However, that department could reach no definitive resolution upon the question whether a health hazard was created.

The report determined, rather, that the department:

could not conclude with certainty whether or not the mercury in amalgam might pose a public health risk; on the one hand, there is no evidence at present that the health of people with amalgam is compromised in any way. Likewise, there is no evidence that removing amalgam has a beneficial effect on health, despite anecdotal reports of 'improvements' after amalgam removal in patients with certain chronic illnesses. (It should also be noted that the removal process itself may expose the patient to additional mercury, and that alternative dental restorative materials could have long-term toxicity problems of their own). On the other hand, given that the evaluation of potential health effects from dental restorative materials, including dental amalgam, will be an ongoing process, the possibility that these materials could pose health risks cannot be ruled out.

This debate was the subject of a segment on a national television program, "60 Min-

utes," a videotape of which was placed in evidence. In that program, both the majority and minority viewpoints were represented. While Huggins did not appear, some dentists and medical providers interviewed insisted that amalgams present health risks. However, the president of the American Dental Association (ADA) and others presented the majority viewpoint and insisted that any dentist recommending the removal of amalgams for the sole purpose of eliminating the mercury vapors would be guilty of "unethical" conduct.

As noted, Huggins has been an active participant in this debate. He has published a book in which he acknowledges that the membership of the ADA and other health organizations have failed to recognize any health dangers from amalgams, but he engages in vigorous arguments, based upon his own alleged clinical studies and observations, that these substances are dangerous.

In addition, Huggins participated in a four-part news program, produced by a local Nevada television station, in which the course of treatment of several patients, who were depicted as being able to walk only with great difficulty before the removal of their amalgams, but whose posture and gait apparently considerably improved thereafter, was described and followed. A videotape of this program, in which Huggins argues his viewpoint upon the question, was also received in evidence.

Prior to the events giving rise to this litigation, plaintiff had amalgams placed in her mouth during the course of treatment from other dentists. Her husband, likewise, had received such treatment. However, plaintiff's husband, who was an employee of the Center, had his amalgams removed, and he attempted to persuade plaintiff to do likewise.

As part of his efforts to persuade plaintiff to adopt this course of action, plaintiff's husband brought home for her review Huggins' book and videotapes of the two television programs described above. It is undisputed that all of these materials are made available to prospective patients at the Center. And, it is the contents of these materials that

plaintiff asserts contained the negligent misrepresentations made by Huggins upon which she relied.

Although plaintiff failed to designate any specific statement in Huggins' book or in either of the videotapes as a material misrepresentation, she asserted that the alleged general message of these materials, that amalgams present a health risk and should be removed (which she rejects as "false"), was what convinced her to go to the Center for dental treatment. And, it was her treatment by Ortegon that resulted in her successful prosecution of the malpractice claim against him and the Center.

This treatment consisted, among other things, in removing five of plaintiff's "root canal" teeth and replacing the amalgams in other teeth with materials that plaintiff asserted were of inferior quality. Nothing within any of the three materials that plaintiff had previously reviewed referred to the removal of teeth with prior root canal work or to the relative quality of various materials with which amalgams can be replaced.

Huggins played no part in any of the treatment provided to plaintiff by Ortegon, nor was there ever a dentist-patient relationship established between plaintiff and Huggins.

## I.

As a preliminary matter, plaintiff seeks to renew her motion, previously denied by another division, to dismiss this appeal because, she claims, it was not filed in a timely fashion. We reject plaintiff's assertions upon this issue.

After the verdicts were received on November 16, 1995, the court on November 27, 1995, directed that judgment enter on those verdicts. That order, however, made no provision for prejudgment interest.

The defendants filed a timely motion for the amendment of the judgment or for a new trial. On January 26, 1996—well within the 60 days allowed for such action by C.R.C.P. 59(j)—the trial court generally denied those motions, but directed that the former judgment be amended in certain respects, including the award of prejudgment interest, and that a written judgment, incorporating the required amendments, be prepared. It was not until February 12, 1996, that a written amended judgment was signed and dated by the court.

The notice of appeal was filed on March 28, 1996, less than 45 days from the court's signing of the amended judgment, and it is from that judgment that this appeal is taken.

On its face, it is apparent that the appeal was filed in a timely manner. *See* C.R.C.P. 58(a); *In re Marriage of Hoffner,* 778 P.2d 702 (Colo.App.1989).

## II.

■ Huggins and the Center argue that, given the circumstances disclosed by the record here, Huggins could not be liable for any alleged negligent misrepresentation made to plaintiff because he owed her no duty of due care. We agree.

In considering this issue, we first emphasize that, in asserting her negligent misrepresentation claim against Huggins, plaintiff does not allege that Huggins, the individual, as distinguished from the Center, had any responsibility for the acts, omissions, or representations of Ortegon, who was her treating dentist. Hence, her claim against Huggins does not present the question whether a treating dentist would be liable for dental malpractice if that dentist made specific recommendations for treatment similar to the general recommendations to be found in Huggins' book. Because Huggins made no such recommendations to plaintiff and she has not pressed any malpractice claim against him, we need not consider that issue.

Further, we note that the sources of information relied upon by plaintiff were not given to her by Huggins. They were provided to her by her husband. Yet, although her husband was an employee of the Center, plaintiff does not assert that *he* made any misrepresentation to her or that he provided the materials to her as the agent of Huggins. Likewise, she does not seek to impose liability upon the Center, based upon her husband's delivery of the materials to her.

Finally, while the videotape of the "60 Minutes" segment was made available to pro-

spective patients of the Center, Huggins did not appear in that videotape, and there is no evidence that he was in any manner responsible for any of the statements made by the persons interviewed. As noted, both the majority viewpoint and the minority viewpoint were presented in that segment.

Plaintiff's claim for negligent misrepresentation, then, must be based solely upon the contents of Huggins' book and of the Nevada television program, both of which were made available for reading or viewing by the general public. And, plaintiff's status with respect to the materials is not significantly different from the status of other members of the public who may have read Huggins' book or viewed the television program. Hence, the question presented by this appeal is the extent to which an author or interviewee on a public television program owes a legal duty of due care to those members of the public who may read the book or view the program.

The tort of negligent misrepresentation is committed if a person "negligently gives false information" to another and that other, acting in reasonable reliance upon such information, takes action that results in that other person's physical harm. Restatement (Second) of Torts § 311 (1993). It is a tort based on negligence, not fraud. *See Ebrahimi v. E.F. Hutton & Co.,* 794 P.2d 1015 (Colo.App.1989).

To recover on a claim based on negligence, it must be shown that the defendant owed a duty of due care to plaintiff, which duty was breached, causing plaintiff damage. *Leake v. Cain,* 720 P.2d 152 (Colo.1986). If the law imposes no duty of due care under the circumstances, no claim based on negligence can be sustained, even though injury may have occurred. *University of Denver v. Whitlock,* 744 P.2d 54 (Colo.1987).

Whether the circumstances of the case give rise to a duty of due care is a question of law for resolution by the court. *Perreira v. State,* 768 P.2d 1198 (Colo.1989). And, if it is determined that a duty exists, the court must also consider the scope of the duty and define the applicable standard of care against which to measure the defen-

dant's conduct. *Bath Excavating & Construction Co. v. Wills,* 847 P.2d 1141 (Colo. 1993).

In determining these questions, the court should consider whether harm is a reasonably foreseeable result of the act or omission under consideration. Whether harm is reasonably foreseeable depends upon common sense perceptions of the risks created by the conditions and circumstances and " 'includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct.' " *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 48 (Colo.1987).

Mere foreseeability of harm, however, does not alone give rise to a duty of care. In addition to the element of foreseeability, the court must consider a number of other factors, including: the social utility of the defendant's activity; the magnitude of the burden of guarding against the harm; the consequences of placing that burden on the defendant; and all other factors that would be relevant in weighing the competing individual and social interests implicated by the specific circumstances. *Perreira v. State, supra.* Whether a legal duty of due care should be recognized, therefore, is essentially a question of fairness under contemporary standards, *i.e.,* whether reasonable persons would recognize a duty and agree that it exists. *See Connes v. Molalla Transport System, Inc.,* 831 P.2d 1316 (Colo.1992).

A consideration of the relevant factors in light of the evidentiary circumstances here leads us to conclude that Huggins owed no duty of due care to plaintiff.

First, we entertain serious doubt whether it was reasonably foreseeable that harm would result to a reader of Huggins' book or to a viewer of the television programs. As noted, these materials clearly acknowledged that a majority of the dental profession did not share Huggins' concern over the health risks of amalgams. Given this disclosure, it is questionable whether one could reasonably rely upon Huggins' views without obtaining additional professional advice of a treating dentist, as plaintiff did here. And, if the recommendation of that treating dentist was

to have the amalgam removed, the legitimate argument could be made that it was that later specific recommendation, and not any earlier statement made by Huggins, that caused any resulting harm.

Nevertheless, even if it be assumed that some harm might have been foreseeable, we conclude that the social utility of encouraging authors to address issues of public concern, and the magnitude of the burden that would be imposed upon them if a duty of care were recognized, far outweigh the private interest of any individual reader, at least in those instances, as here, in which the published work implicates no illegal conduct. *Cf. Braun v. Soldier of Fortune Magazine, Inc.,* 968 F.2d 1110 (11th Cir.1992); *Eimann v. Soldier of Fortune Magazine, Inc.,* 880 F.2d 830 (5th Cir.1989).

■ The expression of opinions upon matters of public concern is the core value protected by the First Amendment. To subject authors of such opinions to the risk of multiple claims for personal injuries, at least in those instances, as here, in which the opinions do not address or impugn any specific individual, based solely upon the majoritarian view that the opinion is "false," would impose an intolerable burden upon the author of such opinions. And, the imposition of such a burden would have a ruinous and unjustifiable chilling effect upon free speech. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

There have been few cases in which readers have sought to recover based upon statements made by authors, and none has been discovered that has allowed recovery, except in those instances in which the publication was intended to be used as a "product." *See, e.g., Saloomey v. Jeppesen & Co.,* 707 F.2d 671 (2d Cir.1983) (aviation charts, designed to be used by aircraft pilots for navigational and other flight purposes, containing incorrect factual information with respect to an airport, was a "defective product").

In all other instances, in light of First Amendment implications, it has been concluded that no duty of due care is owed by an author to a reader. *See Demuth Development Corp. v. Merck & Co.,* 432 F.Supp. 990 (E.D.N.Y.1977) (author of "index" to drugs owed no duty to medical appliance supplier for incorrect information respecting drug used in appliance); *Jaillet v. Cashman,* 235 N.Y. 511, 139 N.E. 714 (1923) (Dow Jones & Co. not liable to subscriber for misinformation as to stock sent out over its ticker).

Our conclusion in this respect is not inconsistent with *Bloskas v. Murray,* 646 P.2d 907 (Colo.1982). There, a physician, in recommending specific surgery to a patient, falsely represented that he had performed the same operation on three other patients and that all had had successful results. In addition, he assured the patient that, if the surgery were unsuccessful, amputation was not a result the patient should worry about. Contrary to his statement, the physician had never before personally performed this type of surgery. The patient consented to the surgery, in reliance upon these statements, but it proved unsuccessful, with the ultimate result that the patient's foot was amputated.

The court rejected plaintiff's assertion that the trial court's instructional error led to the jury's rejection of his claim of malpractice, based upon a lack of informed consent. However, a majority of the court concluded that a claim for negligent misrepresentation was not subsumed by plaintiff's malpractice claim and that the trial court erred in refusing to submit such a claim for jury consideration.

But, the representations in *Bloskas* were one of fact and one of a possible medical result about which there was no evidence of any controversy. Further, the representations were made to a specific patient in conjunction with recommending a specific surgical procedure. In noting these circumstances, the supreme court, while acknowledging that the tort of negligent misrepresentation does not depend upon the existence of a professional relationship, emphasized that the tort's underlying principles are particularly applicable if the representation is made as a part of a business or profession.

In short, none of the considerations that lead us to conclude that Huggins here owed no duty of due care was implicated by the circumstances disclosed in *Bloskas.*

We conclude, therefore, that the trial court's submission of plaintiff's claims for negligent misrepresentation against Huggins and the Center to the jury was error and that its resulting judgment must be reversed.

The judgment against Huggins and the Center, based upon plaintiff's claim against them for negligent misrepresentation, is reversed.

METZGER and MARQUEZ, JJ., concur.