Linda SANDERS, Constance Adams and Cynthia Thirouin, on Their Own Behalf and as Representatives of William David Sanders Their Step Father and Husband of Linda Sanders Thru Next Friend & Personal Attorney, John W. DeCamp, on Their Own Behalf & on Behalf of All Other Columbine Victims Including, Parents, Teachers, Students Living, Injured & Deceased, Plaintiffs,

v.

ACCLAIM ENTERTAINMENT, INC., Activision, Inc., Apogee Software, Inc., Atari Corporation, Capcom Entertainment, Inc., Eidos Interactive, ID Software, Inc., Island Pictures, Inforgames, Inc. f/k/a GT Interactive Software Corp., Interplay Entertainment Corp., Midway Home Entertainment, New Line Cinema, Nintendo of America, Meow Media, Inc., d/b/a www.persiankitty.com, Network Authentication Systems, Inc. d/b/a www.adultkey.com and porntech.com,

Palm Pictures, Polygram, Sega of America, Inc., Sony Computer Entertainment America, Inc., Square Soft, Inc., d/b/a Square USA, Inc., Time Warner, Inc., and Virgin Entertainment Group, Inc. Defendants.

No. CIV.01–B–728.

United States District Court,
D. Colorado.

March 4, 2002.

John W. DeCamp, DeCamp Legal Services, P.C., Lincoln, NE, for plaintiffs.

Gerald Owen Sweeney, Jr., John Thomas Williams, Lord, Bissell & Brook, Chicago, IL, David B. Higgins, Higgins, Hopkins, McLain & Roswell, LLC, Lakewood, CO, James Hubbell, Kelly/Haglund/Garnsey & Kahn LLC, John R. Mann, Kennedy & Christopher, P.C., Denver, CO, James T. Drakeley, Don Wade Cloud, Jr., Hiersche, Hayward, Drakeley & Urbach, P.C., Addison, TX, Thomas B. Kelley, Faegre & Benson, United States District Court, Denver, CO, Paul March Smith, Jenner & Block, Washington, DC, Andrew M. Low, Davis, Graham & Stubbs LLP, United States District Court, Denver, CO, Stefan Darrell Stein, Sherman & Howard, United States District Court, Denver, CO, Christopher Michael Caparelli, Mary Eliz-

abeth McGarry, Simpson, Thacher & Bartlett, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

BABCOCK, Chief Judge.

In this diversity wrongful death action controlled by Colorado tort law, Defendants Acclaim Entertainment, Inc., Activision, Inc., Capcom Entertainment, Inc., EIDOS Interactive, ID Software, Inc., Infogrames, Inc., f/k/a GT Interactive Software Corp., Interplay Entertainment, Corp., Midway Home Entertainment, Nintendo of America, Palm Pictures, Sony Computer Entertainment America, and Time Warner, Inc. move, pursuant to Fed. R.Civ.P. 12(b)(6), to dismiss for failure to state a claim upon which relief can be granted as to all claims brought against them by Plaintiffs Linda Sanders, Constance Adams and Cynthia Thirouin (collectively, Plaintiffs) the widow and stepchildren of William David Sanders, a teacher killed in the April 20, 1999 attack on Columbine High School. Oral argument would not materially assist in determination of the motions. After consideration of the motions, briefs and pertinent case law and for the following reasons, I grant the Rule 12(b)(6) motions.

## I.

### Facts

Plaintiffs allege that Columbine High School (Columbine) students Dylan Klebold and/or Eric Harris, both approximately 17 years of age, were co-conspirators in a plot and scheme to assault, terrorize and kill Columbine teachers and students. On April 20, 1999 at approximately 11:20 a.m., Klebold and Harris approached the school armed with multiple guns and other "weapons of destruction" including explosive devices. *See* Amended C/O, ¶ 3–4.

After shooting at people outside the school, the pair entered the school building and continued their deadly assault inside Columbine. Twelve students and teacher William Sanders were killed. Dozens of others were injured. *Id.* at ¶ 4.

In the aftermath of the massacre the police allegedly learned that Harris and Klebold were avid, fanatical and excessive consumers of violent ... video games ... [and] consumers of movies containing obscenity, obscenity for minors, pornography, sexual violence, and/or violence. Amended C/O ¶¶ 6–7. One movie the pair viewed was "The Basketball Diaries" in which "a student massacres his classmates with a shotgun." Amended C/O ¶ 7.

According to Plaintiffs, "but for the actions of the Video Game Defendants and the Movie Defendants, in conjunction with the acts of the other defendants herein, the multiple killings at Columbine High School would not have occurred." *Id.* at ¶¶ 17, 32. Based on the foregoing, Plaintiffs filed this action on April 19, 2001.

## II.

### Claims and Defendants

Plaintiffs bring the following claims against Defendants:

1. Claim One for negligence and strict liability against Defendants Time Warner, Palm Pictures, Island Pictures, New Line Cinema and Polygram;

2. Claim Two for negligence and strict liability against Defendants Acclaim Entertainment, Inc., Activision, Inc., Apogee Software, Inc., Atari Corporation, Capcom Entertainment, Inc., EIDOS Interactive; ID Software, Inc., Infogrames, Inc., f/k/a GT Interactive Software Corporation, Interplay Entertainment Corp., Midway Home Entertainment, Nintendo of America, Sega of America, Inc., and Sony Computer Entertainment America Inc.; Square Soft,

Inc. d/b/a Square USA, Inc. and Virgin Entertainment Group, Inc.,

3. Claim Three for negligence and strict liability against Defendants Meow Media, Inc. d/b/a www.persiankitty.com and Network Authentication Systems, Inc. d/b/a www.adultkey.com and www.porntech.com; and

4. RICO activity by Defendants Meow Media, Inc. d/b/a www.persiankitty.com and Network Authentication Systems, Inc. d/b/a www.adultkey.com and www.porntech.com.

## III.

### Claims and Allegations

### A. Claim One for Negligence and Strict Liability

Plaintiffs sue Defendants Time Warner, Palm Pictures, Island Pictures, New Line Cinema, and Polygram as the makers and distributors of "The Basketball Diaries." Defendants Time Warner and Palm Pictures (Movie Defendants) filed Rule 12(b)(6) motions which I resolve in this Memorandum Opinion and Order.

According to Plaintiffs, in "The Basketball Diaries, the protagonist inexplicably guns down his teacher and some of his classmates in cold blood, among other acts of gratuitous violence." Amended C/O ¶ 11. Purportedly, this had the effect of "harmfully influencing impressionable minors such as Harris and Klebold and of thereby causing the shootings." *Id.* at ¶ 12.

### B. Claim Two for Negligence and Strict Liability

Plaintiffs sue Defendants Acclaim Entertainment, Inc. (Mortal Kombat and Mortal Kombat II), Activision, Inc. (Wolfenstein, Mech Warrior, Mech Warrior 2, and Nightmare Creatures), Apogee Software, Inc. (Wolfenstein and Doom), Atari Corporation (Doom), Capcom Entertainment, Inc. (Resident Evil), EIDOS Inter-

active (Final Fantasy), ID Software, Inc. (Quake and Doom), Infogrames, Inc. f/k/a GT Interactive Software Corp. (Doom), Interplay Entertainment Corp., (Redneck Rampage), Midway Home Entertainment (Quake and Doom), Nintendo of America (Nightmare Creatures), Sega of America, Inc. (Quake), Sony Computer Entertainment America (Final Fantasy), Square Soft, Inc. d/b/a Square USA, Inc. (Final Fantasy) and Virgin Entertainment Group, Inc. (Resident Evil) for manufacturing and/or supplying the designated violent video games allegedly frequently played by Harris and Klebold. *See* Am C/O ¶¶ 20–21.

Video Game Defendants Acclaim Entertainment, Inc., Activision, Inc., Capcom Entertainment, Inc., EIDOS Interactive, ID Software, Inc., Infogrames, Inc. f/k/a GT Interactive Software Corp., Interplay Entertainment Corp., Midway Home Entertainment, Nintendo of America, Sony Computer Entertainment America, Inc., filed Rule 12(b)(6) motions addressed in this Memorandum Opinion and Order.

Plaintiffs allege that the Video Game Defendants manufactured and/or supplied to Harris and Klebold these video games which made violence pleasurable and attractive and disconnected the violence from the natural consequences thereof, thereby causing Harris and Klebold to act out the violence ... [and] trained [them] how to point and shoot a gun effectively without teaching either of them any of the constraints, responsibilities, or consequences necessary to inhibit such an extremely dangerous killing capacity. Amended C/O ¶¶ 25–25.

### C. Claim Three for Negligence and Strict Liability and Claim Four for RICO Activity

Plaintiffs bring Claims Three and Four against Defendants Meow Media, Inc.

d/b/a www.persiankitty.com and Network Authentication Systems, Inc. d/b/a www.adultkey.com and www.porntech.com. (Internet Defendants). No Rule 12(b)(6) motions have been filed by the Internet Defendants. Consequently, I do not address Claims Three or Four in this Memorandum Opinion and Order.

### D. Allegations Common to the Movie and Video Game Defendants

The negligence and strict products liability Claims One and Two against the Movie and Video Game Defendants contain the following common allegations:

1. Defendants knew that copycat violence would result from the use of their products and materials. *See* Amended C/O ¶¶ 16(a), 29(b);

2. Defendants knew that their products and materials created an unreasonable risk of harm because minors would be influenced by the effect of their products and materials and then would cause harm. *See* Amended C/O ¶¶ 16(k), 29(h);

3. Defendants knew or should have known that their products and materials were in an unreasonably defective condition and likely to be dangerous for the use for which they were supplied. *See* Amended C/O ¶¶ 16(v), 29(v); and

4. Defendants failed to exercise reasonable care to inform consumers of the dangerous condition of their products and materials or of the facts which made their products and materials likely to be dangerous. *See* Amended C/O ¶¶ 16(i), 29(k).

5. Scientific research shows that children who witness acts of violence often tend to act more violently themselves and to sometimes recreate those violent acts. *See* Amended C/O ¶ 13 (Movie Defendants); and

6. Massive volumes of scientific research show that children who witness acts of violence and/or who are interactively involved with creating violence or violent images often act more violently themselves and sometimes recreate the violence to which they have been exposed. *See* Amended C/O ¶ 24 (Video Game Defendants).

### IV.

#### Fed.R.Civ.P. 12(b)(6)

Under Rule 12(b)(6), a district court may dismiss a complaint for failure to state a claim upon which relief can be granted if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). If the plaintiff has pleaded facts that would support a legally cognizable claim for relief, a motion to dismiss should be denied. *Id.* I accept as true all well-pleaded facts, as distinguished from conclusory allegations, and view those facts in the light most favorable to the nonmoving party. *Maher v. Durango Metals*, 144 F.3d 1302, 1304 (10th Cir.1998). All reasonable inferences must be construed in the plaintiff's favor. *See Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir.1998). *Id.*

Fed.R.Civ.P. 12(b) provides that if matters outside the complaint are presented to and not excluded by the court, it should treat the motion to dismiss as a summary judgment motion. Fed.R.Civ.P. 12(b); *Carter v. Stanton*, 405 U.S. 669, 671, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972); *Foremaster v. St. George*, 882 F.2d 1485, 1491 (10th Cir.1989). Failure to convert a motion to dismiss so postured to a motion for summary judgment under Fed.R.Civ.P. 56 is reversible error. *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir.1991).

Several Video Game Defendants and Movie Defendant Palm Pictures at-

tached exhibits to briefs in support of their Rule 12(b)(6) motions. These exhibits include the complaint filed in *James v. Meow Media, Inc.,* 90 F.Supp.2d 798 (W.D.Ky. 2000), a copy of a hearing transcript, copies of several opinions, and portions of the Restatement of (Third) Torts relied on in their briefs by Defendants. I have not read or relied on the *James v. Meow Media* complaint or on the hearing transcript. Defendants' exhibits containing copies of case law and Restatement (Third) of Torts merely supplement and inform my legal research. Also, Plaintiffs attached a letter to its response briefs to Defendants ID Software's and Midway Home Entertainment's Fed.R.Civ.P. 12(b)(6) opening briefs. I have not read or relied on the content of the attached letter. Thus, I need not treat the motions to dismiss as summary judgment motions. *See* Fed. R.Civ.P. 12(b); *Carter v. Stanton,* 405 U.S. at 671, 92 S.Ct. 1232; *Foremaster,* 882 F.2d at 1491.

The Rule 12(b)(6) motions, briefs in support and briefs in opposition were filed before Plaintiffs filed their Amended Complaint as a matter of right. After careful review I conclude that further briefing is unnecessary. The motions and briefs before me can be fully applied to and resolved in light of the Amended Complaint.

## V.

### Claims Analysis

#### A. Negligence

■ Plaintiffs allege negligence in Claim One against the Movie Defendants and in Claim Two against the Video Game Defendants. Under Colorado law, to recover for the negligent conduct of another, a plaintiff must establish: 1) the existence of a legal duty owed to the plaintiff by the defendant; 2) breach of that duty; 3) injury to the plaintiff; and 4) actual and proximate causation. *Leake v. Cain,* 720 P.2d 152, 155 (Colo.1986).

#### 1. *Duty*

■] "The court determines, as a matter of law, the existence and scope of [any] duty...." *Metropolitan Gas Repair Serv., Inc. v. Kulik,* 621 P.2d 313, 317 (Colo. 1980). *See Perreira v. Colorado,* 768 P.2d 1198, 1208 (Colo.1989). If the law imposes no duty of care under the circumstances, a negligence claim cannot be sustained even though injury may have occurred. *University of Denver v. Whitlock,* 744 P.2d 54 (Colo.1987).

■] In resolving the threshold legal question whether the Video Game and Movie Defendants have a cognizable duty to the Plaintiffs, I consider: 1) foreseeability of the injury or harm that occurred; 2) the social utility of Defendants' conduct; 3) the magnitude of the burden of guarding against the injury or harm; and 4) the consequences of placing the burden on the Defendants. *See Bailey v. Huggins Diagnostic & Rehabilitation Center,* 952 P.2d 768 (Colo.App.1997), *cert. denied,* (Colo. 1998); *Smith v. City & County of Denver,* 726 P.2d 1125, 1127 (Colo.1986). No single factor is controlling. *Whitlock,* 744 P.2d at 57.

■ The question whether a duty should be imposed in a particular case is "essentially one of fairness under contemporary standards—whether reasonable persons would recognize a duty and agree that it exists." *Taco Bell, Inc. v. Lannon,* 744 P.2d 43, 46 (Colo.1987). Generally, a person does not have a duty to prevent a third person from harming another absent special circumstances warranting imposition of such a duty. *See Davenport v. Community Corrections,* 962 P.2d 963, 967 (Colo.1998), *cert. denied,* 526 U.S. 1068, 119 S.Ct. 1462, 143 L.Ed.2d 547 (1999).

#### a. *Foreseeability*

The Colorado Supreme Court teaches that foreseeability is "based on common sense

perceptions of the risks created by various conditions and circumstances and includes whatever is likely enough in the setting of modern life that a reasonably thoughtful person would take account of it in guiding practical conduct." *Perreira*, 768 P.2d at 1209.

■■■ Generally, under Colorado law a person has no responsibility to foresee intentional violent acts by others. *See Walcott v. Total Petroleum, Inc.*, 964 P.2d 609, 612 (Colo.App.1998), *cert. denied*, (Colo. 1999) (Gas station owner could not reasonably foresee that a purchaser would intentionally throw gasoline on a victim and set the victim on fire); *see also Solano v. Goff*, 985 P.2d 53, 54–55 (Colo.App.), *cert. denied*, (Colo.1999) (a murder committed by an escaped inmate who had not committed any prior violent crimes was not foreseeable by the sheriff).

■■■ In the circumstances alleged here, the Video Game and Movie Defendants likewise had no reason to suppose that Harris and Klebold would decide to murder or injure their fellow classmates and teachers. Plaintiffs do not allege that these Defendants had any knowledge of Harris' and Klebold's identities, let alone their violent proclivities. Nor, for that matter, did the Video Game and Movie Defendants have any reason to believe that a shooting spree was a likely or probable consequence of exposure to their movie or video games. At most, based on Plaintiffs' allegations that children who witness acts of violence and/or who interactively involved with creating violence or violent images often act more violently themselves and sometimes recreate the violence, *see* Amended C/O ¶ 24, these Defendants might have speculated that their motion picture or video games had the potential to stimulate an idiosyncratic reaction in the mind of some disturbed individuals. A speculative possibility, however, is not enough to create a legal duty. *See Daven-*

*port*, 962 P.2d at 968 ("While it is foreseeable that reintroducing convicted criminals into the community will result in some aberrant behavior, the dangers associated with community corrections in general are insufficient to establish the requisite foreseeability needed to impose a duty of care [on community corrections facility]").

Although other courts have addressed this question, the Colorado courts have not had the occasion to consider foreseeability in the similar circumstances alleged here. Applying analogous foreseeability principles, two federal courts have rejected imposition of any such duty on video game makers and movie producers or their distributors. In *Watters v. TSR, Inc.*, 904 F.2d 378 (6th Cir.1990), the Sixth Circuit held that a game manufacturer did not have any duty under Kentucky tort law to anticipate and prevent the suicide of a disturbed player because such idiosyncratic reactions are not legally foreseeable. The Court held that to impose liability in such circumstances "would be to stretch the concept of foreseeability . . . to lengths that would deprive them of all normal meaning." *Id.* at 381.

More recently, in *James v. Meow Media, Inc.*, 90 F.Supp.2d 798, the Court dismissed Plaintiffs' complaint asserting virtually identical claims filed by Plaintiffs in this case. *James v. Meow Media, Inc.* involved a student shooting at a Kentucky high school during which three students were killed and several others seriously injured. The Court accepted as true, as do I, the identical allegations in this case that: 1) the shooter[s] viewed "The Basketball Diaries" film; 2) were "avid consumer[s]" of video games; and 3) were influenced by the film and video games. Stating that "[n]othing Defendants did or failed to do could have been reasonably foreseen as a cause of injury," the Court held that reasonable people could not con-

clude that the shooter's exposure to video games and the movie made the shooter's actions foreseeable to the video game makers and the movie producers and distributers. *See id.* at 804, 806.

Courts around the country have rejected similar claims brought against media or entertainment defendants. In *Zamora v. Columbia Broadcasting System*, 480 F.Supp. 199 (S.D.Fla.1979), the Court held that it was not foreseeable to three television networks that a teenager would shoot and kill his neighbor after viewing comparable violence on television over a ten year period. Plaintiff alleged also that watching television had desensitized the teenager to violence and caused him to develop a sociopathic personality. In granting the defendants' motion to dismiss, the *Zamora* Court noted that the three major networks are charged with anticipating: 1) the minor's alleged voracious intake of television violence; 2) his parents' apparent acquiescence in his television viewing, presumably without recognition of any problem; and 3) that Zamora would respond with a violent criminal act. *See id.* at 202. Based in part on the lack of foreseeability, the Court declined to "create such a wide expansion in the law of torts." *Id.* at 203. *See also Brandt v. Weather Channel, Inc.*, 42 F.Supp.2d 1344, 1345–46 (S.D.Fla.1999), *aff'd*, 204 F.3d 1123 (11th Cir.1999) (rejecting "novel and unprecedented expansion of . . . tort law [ ] to impose on a television broadcaster of weather forecasts" a duty to viewer of forecast who drowned when unpredicted adverse weather conditions caused him to be thrown from a fishing boat); *Davidson v. Time Warner. Inc.*, 1997 WL 405907 *13 (S.D.Tex.1997) (rejecting claim that "rap" song caused listener to commit murder because murder "was an irrational and illegal act," the defendants had no duty "to foresee and plan against such conduct"); *McCollum v. CBS, Inc.* 202 Cal.App.3d 989, 996, 1005, 249 Cal.Rptr. 187 (1988) (dismissing claim against defendants who created and disseminated a song called "Suicide Solution" and who allegedly knew or should have known the song might influence susceptible individuals because decedent's suicide was unforeseeable); *Way v. Boy Scouts of America*, 856 S.W.2d 230, 236, 239 (Tex.App.Dallas 1993) (holding decedent's fatal experimentation with gun was not reasonably foreseeable consequence of publishing a shooting sports supplement); *Sakon v. Pepsico, Inc.*, 553 So.2d 163, 166 (Fla.1989) (concluding, at pleadings stage, that young viewer's injury, which allegedly was inspired by defendant's television advertisement depicting dangerous activity, was not foreseeable consequence of advertisement, even though advertisement targeted audience of young viewers).

I find persuasive the reasoning set out in these cases. Consequently, I conclude under similar Colorado tort law, there is no basis for determining that violence would be considered the likely consequence of exposure to video games or movies. This factor weighs heavily against imposing a duty on the Movie and Video Game Defendants.

b. *Social Utility of Defendants' Conduct*

Creating and distributing works of imagination, whether in the form of video games, movies, television, books, visual art, or song, is an integral component of a society dedicated to the principle of free expression. *See* U.S. CONST., amend. 1; COLO. CONST., art. 11, § 10 ("[n]o law shall be passed impairing the freedom of speech [and] that every person shall be free to speak, write or publish whatever he will on any subject"); *see also* U.S. CONST. art. I, § 8 (giving Congress the power to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclu-

sive Right to their respective Writings and Discoveries."). Accordingly, the creation of such works significantly contributes to social utility. *See. e.g., Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (recognizing that movies are a significant medium for the communication of ideas because "[t]hey may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression," and that movies are an important "organ of public opinion."). *Id.* at 501, 72 S.Ct. 777.

Plaintiffs' characterization of the Video Game and Movie Defendants' creative works as "violent" does not alter the social utility analysis. In the context of ordering entry of a preliminary injunction against a city ordinance that limited minors' access to violent video games, the Seventh Circuit observed, "[v]iolence has always been and remains a central interest of humankind and a recurrent, even obsessive theme of culture both high and low." *American Amusement Mach. Ass'n v. Kendrick,* 244 F.3d 572, 577 (7th Cir.2001), *cert. denied,* —— U.S. ——, 122 S.Ct. 462, 151 L.Ed.2d 379 (2001). Indeed, "[c]lassic literature and art, and not merely today's popular culture, are saturated with graphic scenes of violence, whether narrated or pictorial." *Id.* at 575. Moreover, the *Kendrick* Court acknowledged that video games that include pictorial representations of violence are "stories" and contain "age-old themes of literature." *Id.* at 577–78. The Court flatly rejected the notion that society is better served by insulating the vulnerable from exposure to such images:

> To shield children ... from exposure to violent descriptions and images would not only be quixotic, but deforming; it

would leave them unequipped to cope with the world as we know it.

*Id.* at 577.

Setting aside any personal distaste, as I must, it is manifest that there is social utility in expressive and imaginative forms of entertainment even if they contain violence. *See Kendrick,* 244 F.3d at 577. Hence, the social utility factor weighs heavily against imposing a duty against the Video Game and Movie Defendants.

c. and d. *Magnitude of the Burden of Guarding against Injury or Harm and Consequences of Placing the Burden on the Defendant*

In *Bailey,* 952 P.2d at 772–73, the Colorado Court of Appeals analyzed the question of tort law duty where imposition of such a duty would seriously encroach upon First Amendment values. There, the author of a book appeared on a television program to discuss his controversial views about a particular dental procedure. The plaintiff followed his advice and was injured. In the resulting lawsuit, the Court held that as a general rule, "an author or interviewee on a public television program owes [no] legal duty of due care to those members of the public who may read the book or view the program." *Id.* at 772. Furthermore, the Court expressed serious doubts about the foreseeability of the harm. *See id.* at 772–73. The Court then explained that even if the harms were foreseeable, the First Amendment values at stake counseled against imposing a tort duty based on the contents of an author's ideas. *See id.* at 773.

Colorado courts have repeatedly rejected efforts to impose overly burdensome and impractical obligations on defendants, including the obligation to identify potential dangers. This is especially so where those obligations would interfere with the social utility of a defendant's conduct or

other important societal values. *See e.g., Davenport,* 962 P.2d at 969 (rejecting duty on community corrections program to screen out offenders posing a threat to the public and to restrict offenders' community access where such measures would make the program the "insurer of its residents" and would subvert the effectiveness of the program). *See also Observatory Corp. v. Daly,* 780 P.2d 462, 469 (Colo.1989) (rejecting imposition of a duty on tavern owners to all persons on its premises because "[t]o impose such a duty would be tantamount to requiring a tavern employee to divine future violence on the part of a tavern patron notwithstanding the absence of any objective evidence indicating that the patron constituted an unreasonable risk to the safety of others," thereby making the tavern owner a "virtual insurer of the safety of all persons").

Given the First Amendment values at stake, the magnitude of the burden that Plaintiffs seek to impose on the Video Game and Movie Defendants is daunting. Furthermore, the practical consequences of such liability are unworkable. Plaintiffs would essentially obligate these Defendants, indeed all speakers, to anticipate and prevent the idiosyncratic, violent reactions of unidentified, vulnerable individuals to their creative works. As the Sixth Circuit recognized in *Watters:*

> The defendant cannot be faulted, obviously, for putting its game on the market without attempting to ascertain the mental condition of each and every prospective player. The only practicable way of insuring that the game could never reach a "mentally fragile" individual would be to refrain from selling it at all.

*Id.* at 381; *McCollum,* 202 Cal.App.3d 989, 249 Cal.Rptr. 187. ("[I]t is simply not acceptable to a free and democratic society to impose a duty upon performing artists to limit and restrict their creativity in or-

der to avoid the dissemination of ideas in artistic speech which may adversely affect emotionally troubled individuals.") *Id.* at 1005–06, 249 Cal.Rptr. 187; *Zamora,* 480 F.Supp. at 202 (recognizing the "impositions pregnant" in charging television networks with the duty of anticipating minors' criminal response to television programs). Because Plaintiffs' legal theory would effectively compel Defendants not to market their works and, thus, refrain from expressing the ideas contained in those works, the burden imposed would be immense and the consequences dire for a free and open society.

In this case, Plaintiffs do not allege that the Video Game and Movie Defendants *illegally* produced or distributed the movie and video games Harris and Klebold allegedly viewed or played. Finding that these Defendants owed Plaintiffs a duty of care would burden these Defendants' First Amendment rights to freedom of expression. These considerations compel the conclusion that makers of works of imagination including video games and movies may not be held liable in tort based merely on the content or ideas expressed in their creative works. Placing a duty of care on Defendants in the circumstances alleged would chill their rights of free expression. Therefore, these factors also weigh heavily against imposing a duty on Defendants.

All four factors weigh heavily against imposing a duty of care on Defendants. Consequently, I hold that the Video Game and Movie Defendants owed no duty to Plaintiffs as a matter of law. Thus, the Video Game and Movie Defendants are entitled to Rule 12(b)(6) dismissal of Plaintiffs' negligence claims.

### 2. Causation

Even assuming a duty, the Video Game and Movie Defendants argue that they

were not the legal cause of Plaintiffs' injuries. I agree.

To prevail on their negligence claim, Plaintiffs must show that Defendants' tortious conduct proximately caused Mr. Sanders' death. *See Leake,* 720 P.2d at 155. "[Proximate cause] is the cause without which the claimed injury would not have been sustained." *City of Aurora v. Loveless,* 639 P.2d 1061, 1063 (Colo.1981). In Colorado, causation is generally a question of fact for a jury. But a court may decide the issue as a matter of law where the alleged chain of causation is too attenuated to impose liability. *See Largo Corp. v. Crespin,* 727 P.2d 1098, 1103 (Colo. 1986); *Smith v. State Compensation Ins. Fund,* 749 P.2d 462, 464 (Colo.App.1987). Here, proximate cause requires that Defendants' conduct produced Mr. Sanders' death "in the natural and probable sequence of things." *See Loveless,* 639 P.2d at 1063; *Schneider v. Midtown Motor Co.,* 854 P.2d 1322 (Colo.App.1992).

Where the circumstances make it likely that a defendant's negligence will result in injuries to others and where this negligence is a substantial factor in causing the injuries sustained, proximate causation is satisfied. The intervening or superseding act of a third party, in this case Harris and Klebold, including a third-party's intentionally tortious or criminal conduct does not absolve a defendant from responsibility if the third-party's conduct is reasonably and generally foreseeable. *See Ekberg v. Greene,* 196 Colo. 494, 496–97, 588 P.2d 375, 376–77(1978).

It is undisputed that Harris and Klebold murdered or injured the Columbine victims including Mr. Sanders. The issue is whether Harris' and Klebold's intentional criminal acts constitute a superseding cause of the harm inflicted by them, thus relieving the Movie and Video Game Defendants' of liability.

A superseding cause exists when: 1) an extraordinary and unforeseeable act intervenes between a defendant's original tortious act and the injury or harm sustained by plaintiffs and inflicted by a third party; and 2) the original tortious act is itself capable of bringing about the injury. Just as foreseeability is central to finding that a duty is owed, it is also "the touchstone of proximate cause" and of the superseding cause doctrine. *Walcott,* 964 P.2d 609; *see also Smith,* 749 P.2d at 462–63; *Ekberg,* 588 P.2d at 376. Moreover, a superseding cause relieves the original actor of liability when "the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct." *Webb v. Dessert Seed Co.,* 718 P.2d 1057, 1062–63 (Colo. 1986) (quoting Restatement (Second) of Torts § 442B).

I hold in this case that Harris' and Klebold's intentional violent acts were the superseding cause of Mr. Sanders' death. Moreover, as I have determined, their acts were not foreseeable. Their criminal acts, therefore, were not within the scope of any risk purportedly created by Defendants. In this case as in *James v. Meow Media, Inc.,* 90 F.Supp.2d at 806–08, the school shooting was not a normal response to dissemination of movies and videos.

I conclude as a matter of law that no reasonable jury could find that the Video Game and Movie Defendants' conduct resulted in Mr. Sanders' death in "the natural and probable sequence of events." *See Loveless,* 639 P.2d at 1063. Therefore, Defendants were not a proximate cause of Mr. Sanders' injuries. Defendants are entitled to Rule 12(b)(6) dismissal as to the negligence claims in Claims One and Two.

## B. Strict Liability

Plaintiffs also assert strict liability in Claims One and Two. Plaintiffs allege that

the Movie and Video Game Defendants produced and distributed their "products" in "a defective ... and unreasonably dangerous condition." *See* Amended C/O ¶¶ 16(v), 29(v); Restatement (Second) of Torts § 402A.

Plaintiffs allege that these Defendants manufactured and/or supplied to Harris and Klebold video games:

> [that] trained Harris and Klebold how to point and shoot a gun effectively without teaching either of them any of the constraints, responsibilities or consequences necessary to inhibit such an extremely dangerous killing capacity.

Amended C/O ¶¶ 25–26.

There is no allegation that anyone was injured while Harris and Klebold actually played the video games or watched "The Basketball Diaries." The actual use of the movie and video games, then, did not result in any injury. Rather, Plaintiffs contend that Mr. Sanders' death was caused by the way Harris and Klebold interpreted and reacted to the messages contained in the movie and the video games. So, any alleged defect stems from the intangible thoughts, ideas and messages contained within the movie and video games but not their tangible physical characteristics.

 To recover on a theory of strict products liability under Colorado law, Plaintiffs must establish that the: 1) products are in a defective condition unreasonably dangerous to the user or consumer; 2) products were expected to and did reach Harris and Klebold without substantial change in the condition in which they were sold; 3) alleged defects caused Mr. Sanders' death; 4) Video Game and Movie Defendants sold the product and are engaged in the business of selling products; and 5) Plaintiffs sustained damages as a result of the Video Game and Movie Defendants' acts. *See Barton v. Adams Rental,* 938 P.2d 532, 536–37 (Colo.1997). This strict liability theory requires the existence of a "product" within the meaning of the law. *St. Luke's Hospital, v. Schmaltz,* 188 Colo. 353, 358, 534 P.2d 781, 783–84 (1975). The threshold question is whether Mr. Sanders' death was caused by a "product." *See Hidalgo v. Fagen, Inc.,* 206 F.3d 1013, 1018 (10th Cir.2000) *citing Schmaltz,* 534 P.2d at 784.

### 1. *Definition of Product*

 Colorado's products liability statute does not define the term "product." *See* § 13–21–401, C.R.S. Section 402A of the Restatement (Second) of Torts, adopted by the Colorado courts, *see e.g., Camacho v. Honda Motor Co.,* 741 P.2d 1240, 1244 (Colo.1987), also does not define "product." As a result, whether something is a "product" is a question of law for the Court to answer. *Smith v. Home Light & Power Co.,* 695 P.2d 788, 789–90 (Colo.App.1984). Therefore, as an initial matter I must determine whether thoughts, images, ideas, and messages contained in movies and video games constitute "products" for purposes of strict products liability.

Colorado courts have not yet considered whether thoughts, images, ideas, and messages are "products" pursuant to the strict liability doctrine. Significantly, however, in considering whether to recognize a new tort recovery theory, the Colorado courts give great weight to the theory's impact on free expression. *See Bailey,* 952 P.2d 768. (dentist did not owe duty of care to patients with respect to statements made on television program and in book in light of free speech implications).

To aid my anticipation as to how Colorado courts would resolve this question, I look to other jurisdictions which have addressed whether the content of video games and movies is a "product" for purposes of determining strict liability. In *Watters,* the Court reviewed existing pre-

cedents and concluded, "[a]s far as we have been able to ascertain, ... the doctrine of strict liability has never been extended to words or pictures. Other courts have looked in vain for decisions so expanding the scope of the strict liability doctrine." *Id.* at 381. For this reason, the *Watters* Court rejected plaintiff's contention that the video game defendant was strictly liable for causing her son, who had repeatedly played defendant's fantasy adventure game, to commit suicide. *Id.* Based in part on *Watters'* reasoning, the *James v. Meow Media, Inc.* Court also rejected as a matter of law the plaintiffs' claims, identical to the claims asserted in this case, that The Basketball Diaries and the video games were "products" for purposes of the strict liability doctrine. *See James v. Meow Media, Inc.,* 90 F.Supp.2d at 811.

Plaintiffs argue that "intangibles" such as images, thoughts, ideas, and messages are products and "subject to strict liability [when] the 'intangibles' are sold to and consumed by the public." Plaintiffs rely on *Comshare, Inc. v. United States,* 27 F.3d 1142 (6th Cir.1994) and *Advent Systems Ltd. v. Unisys Corp.,* 925 F.2d 670 (3d Cir.1991). These cases are distinguishable.

In *Comshare,* a computer software company sued the government to obtain an income tax refund because the company had spent millions of dollars purchasing computer program source codes but had not been given a tangible property investment tax credit. *See id.* The Sixth Circuit held that Comshare was entitled to the tangible property tax credit because "the intangible information on Comshare's master source code tapes and discs could not exist in usable form without the tangible medium." *Id.* at 1149. In *Advent Systems,* a commercial transactions case, the Third Circuit held that once a computer program is downloaded onto a diskette,

it becomes a "good" under the Uniform Commercial Code. *See id.* at 675.

Contrary to Plaintiffs' analysis, these holdings are inapposite because they do not discuss strict liability theories and are unrelated to products liability law. While computer source codes and programs may be construed as "tangible property" for tax purposes and as "goods" for commercial purposes, these classifications do not establish that intangible thoughts, ideas, and messages contained in computer video games or movies should be treated as products for purposes of strict liability.

Plaintiffs fail to appreciate the critical distinction between intangible properties and tangible properties for which strict liability can be imposed. The Ninth Circuit explained this distinction in *Winter v. G.P. Putnam's Sons,* 938 F.2d 1033 (9th Cir.1991):

> A book containing Shakespeare's sonnets consists of two parts, the material and the print therein, and the ideas and expression thereof. The first may be a product, but the second is not. The latter, were Shakespeare alive, would be governed by copyright laws; the laws of libel to the extent consistent with the First Amendment; and the laws of misrepresentation, negligent misrepresentation, negligence, and mistake. These doctrines applicable to the second part are aimed at the delicate issues that arise with respect to intangibles such as ideas and expression. Products liability law is geared to the tangible world.

*Id.* at 1034.

The reasoning of *Watters* and *Meow Media* is buttressed by the Restatement (Third) of Torts. Although Colorado courts have yet to adopt sections of Restatement (Third) of Torts, I predict that the Colorado Supreme Court, as it has often done in the past, will selectively adopt relevant sections in the Restatement

(Third) of Torts. There, the word "product" is defined and a distinction is made between tangible and intangible properties. *See* Restatement (Third) of Torts 19(a); comment d. to § 19(a). Moreover, the commentary for § 19(a) of the Restatement (Third) of Torts notes that courts "have, appropriately refused to impose strict product liability" in cases where the plaintiff's grievances were "with the information, not with the tangible medium." *Id.* at comment d.

Based on the persuasive reasoning set out in *Watters, James, Winter,* and the Restatement (Third) of Torts, I hold that intangible thoughts, ideas, and expressive content are not "products" as contemplated by the strict liability doctrine.

### 2. *Causation*

■ Assuming *arguendo* that the strict liability doctrine could be extended to include the thoughts, ideas, images and messages contained in video games and movies, Plaintiffs nevertheless would be required to allege adequately causation in order to state a claim based on strict liability. As I have stated, causation is trumped by an intervening act that constitutes a superseding cause. I determined as a matter of law that Harris' and Klebold's actions constituted a superseding cause which broke any chain of causation. *See* § V(A)(1)(a). Therefore, in the alternative, Plaintiffs' strict liability claims fail for lack of causation.

### C. First Amendment Considerations

#### 1. *Protection of Video Games*

■ Relying on the following cases, Plaintiffs contend that video games are not protected by the First Amendment. *See America's Best Family Showplace Corp. v. New York,* 536 F.Supp. 170 (E.D.N.Y. 1982); *Rothner v. Chicago,* 929 F.2d 297 (7th Cir.1991) (affirming district court ruling that video games lack a vital informa-

tive element and therefore are not protected by the First Amendment). These cases are not persuasive because they have been superseded or are directly contrary to established precedent. *Rothner* was superseded by the Seventh Circuit's recent decision in *Kendrick,* 244 F.3d at 577–78 (recognizing that video games contain stories, imagery, "age-old themes of literature,"and "messages, even an 'ideology,' just as books and movies do"). The *America's Best* Court expressed the premise that video games are not protected by the First Amendment because they contain "pure entertainment with no informational element." This premise is directly contrary to the Supreme Court's teaching that the distinction between information and entertainment is so minuscule, that both forms of expression are entitled to First Amendment protection. *See Time, Inc. v. Hill,* 385 U.S. 374, 388, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Plaintiffs have failed to show that video games deserve anything less than full First Amendment protection.

#### 2. *Brandenburg Test*

■ Whether expressive content is protected under the First Amendment is subject to the test set forth in *Brandenburg v. Ohio,* 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969). Under *Brandenburg,* even speech that expressly advocates criminal activity cannot be the basis for liability, unless the speech is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447, 89 S.Ct. 1827.

The *Brandenburg* test is exacting. Other courts uniformly reject claims similar to those of Plaintiffs' here. I reject Plaintiffs' invitation to dilute the *Brandenburg* test in this case.

Plaintiffs contend that *Brandenburg* protects only "marginalized political speakers." *See* Resp., p. 16. I disagree. *Bran-*

*denburg* did not limit its test to political speech or political speech of marginalized speakers. Nor have lower courts accepted such a limitation. *See e.g. Herceg v. Hustler Magazine, Inc.,* 814 F.2d 1017 (5th Cir.1987), *cert. denied,* 485 U.S. 959, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988) in which the Fifth Circuit stated:

> [T]he Supreme Court generally has not attempted to differentiate between different categories of protected speech for the purposes of deciding how much constitutional protection is required. Such an endeavor would not only be hopelessly complicated but would raise substantial concern that the worthiness of speech might be judged by majoritarian notions of political and social propriety and morality. If the shield of the First Amendment can be eliminated by proving after publication that an article discussing a dangerous idea negligently helped bring about a real injury simply because the idea can be identified as "bad," all free speech becomes threatened. An article discussing the nature and danger of "crack" usage—or of hang-gliding—might lead to liability just as easily. As is made clear in the Supreme Court's decision in *Hess,* the "tendency to lead to violence" is not enough.

*Id.* at 1024.

Alternatively, Plaintiffs argue that *Brandenburg's* imminence requirement is met by the advocacy of illegal action "at some future time...." *See* Resp., p. 17. This argument is contrary to binding precedent. "The First Amendment does not permit someone to be punished for advocating illegal conduct at some indefinite future time." *National Gay Task Force v. Board of Education,* 729 F.2d 1270, 1274 (10th Cir.1984) *citing Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973), *aff'd,* 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985). *Hess* holds that

speech cannot be deemed unprotected when, as is the case here, defendants' speech, is "not directed to any person or group of persons." *See Hess,* 414 U.S. at 108, 94 S.Ct. 326.

Plaintiffs rely also on *Rice v. Paladin Enterprises, Inc.,* 128 F.3d 233 (4th Cir. 1997), *cert. denied,* 523 U.S. 1074, 118 S.Ct. 1515, 140 L.Ed.2d 668 (1998) in which the Fourth Circuit held that the publisher of a book entitled "Hit Man: A Technical Manual for Independent Contractors" might be held liable in a wrongful death action. However, the defendant stipulated that

> [it] not only knew that its instructions might be used by murderers, but that it actually intended to provide assistance to murderers and would-be murderers which would be used by them 'upon receipt,' and that it in fact assisted [the murderer] in particular in the commission of the murders [at issue].

*Id.* at 242. Largely based on this stipulation, the *Rice* Court reached the narrow holding that civil liability for aiding and abetting criminal conduct is constitutionally permissible where a publisher "has the specific purpose of assisting and encouraging commission of such conduct and the alleged assistance and encouragement takes a form other than abstract advocacy." *Id.* at 243.

Plaintiffs' Complaint is devoid of any allegation that the Movie and Video Game Defendants had any intent, let alone a specific intent, to assist and encourage anyone to engage in acts of criminal violence. Moreover, *Rice* distinguished the "copycat" theory presented here, where "someone imitates or 'copies' conduct ... described or depicted in their broadcasts, publications, or movies." *Id.* at 265. The *Rice* Court stated that "it will presumably never be the case that the broadcaster or publisher actually intends" to assist or encourage a crime. Consequently "an infer-

ence of impermissible intent on the part of the producer ... would be unwarranted as a matter of law." *Id.* at 265–66. *Rice's* limited holding is inapplicable in this case.

Plaintiffs do not discuss compliance with *Brandenburg's* second requirement that the speech at issue must be "likely" to produce imminent lawless action. *See Brandenburg*, 395 U.S. at 447–48, 89 S.Ct. 1827. As explained in section V(A)(1)(a), Plaintiffs cannot, as a matter of law, demonstrate that the video games and movie were "likely" to cause any harm, let alone imminent lawless action.

### 3. *Restriction of the First Amendment Rights of Children*

 Next, Plaintiffs contend that even if video games invoke First Amendment protections, the right to free speech of children may be restricted in a reasonable manner. I disagree.

It is well-established that *Brandenburg* remains the applicable standard even where the individual allegedly incited to commit unlawful acts is a minor. *See e.g. Miller v. California*, 413 U.S. 15, 33, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) ("likely" impact of speech must judged by its effect on "average person[s], rather than a particularly susceptible or sensitive person").

Assuming the State of Colorado has a compelling interest in broadly extending its tort law to protect the physical and psychological well-being of minors, the restriction must be "narrowly tailored" to serve that compelling interest in order to withstand First Amendment scrutiny. *See Reno v. ACLU*, 521 U.S. 844, 879, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). The United States Supreme Court has been particularly wary of governmental restrictions, such as those seemingly advocated by Plaintiffs here, that rest "on a common law concept of the most general and undefined nature." *See Bridges v. California*, 314 U.S. 252, 260, 62 S.Ct. 190, 86 L.Ed.

192 (1941) *quoting Cantwell v. Connecticut* 310 U.S. 296, 308, 60 S.Ct. 900, 84 L.Ed. 1213 (1940).

Plaintiffs' theory fails the narrow tailoring test because it is not limited to the protection of minors. It would apply even when an adult allegedly commits violence in response to video games or movies. Thus, adults' access to movies and video games would be restricted as well. The theory is, as a matter of law, overbroad. *See Reno*, 521 U.S. at 875, 878–89, 117 S.Ct. 2329.

Furthermore, because the Movie and Video Game Defendants cannot possibly control who gains access to their games and movies, they could avoid liability under Plaintiffs' theory only by ceasing production and distribution of their creative works. *See Watters*, 904 F.2d at 381. Such a sweeping theory of liability and the chilling of free expression cannot be considered narrowly tailored.

## VI.

### Conclusion

### A. Negligence Claims

Plaintiffs' negligence claims fail because as a matter of law the Video Game and Movie Defendants owed no duty to Plaintiffs or Mr. Sanders. In the alternative, Plaintiffs' negligence claims cannot stand because Harris' and Klebold's actions on April 20, 1999 were a superseding cause of Mr. Sanders' death.

### B. Strict Liability Claims

Plaintiffs' strict liability claims against the Video Game and Movie Defendants fail as a matter of law because the intangible thoughts, ideas, images, and messages contained in "The Basketball Diaries" and video games allegedly played by Harris and Klebold are not products as required by the strict liability doctrine. Further-

more, I have determined that Harris' and Klebold's actions on April 20, 1999 constituted a superseding cause relieving Defendants of liability.

## C. First Amendment

Plaintiffs' negligence and strict liability claims fail the *Brandenburg* test.

Accordingly, IT IS ORDERED that:

1. the Fed.R.Civ.P. 12(b)(6) motions to dismiss Claim One for negligence and Claim Two for strict liability filed by Defendants Time Warner, Inc. and Palm Pictures are GRANTED;

2. the Fed.R.Civ.P. 12(b)(6) motions to dismiss Claim One for negligence and Claim Two for strict liability filed by the following Defendants are GRANTED:

 a. Acclaim Entertainment, Inc.;

 b. Activision, Inc.;

 c. Capcom Entertainment, Inc.;

 d. EIDOS Interactive;

 e. ID Software, Inc.;

 f. Infogrames, Inc. f/k/a GT Interactive Software Corporation;

 g. Interplay Productions, Inc.;

 h. Midway Home Entertainment;

 i. Nintendo of America;

 j. Sony Computer Entertainment America, Inc.; and

 k. Square Soft, Inc. d/b/a Square USA, Inc.

3. Claims One and Two are DISMISSED as to the above named Defendants; and

4. upon submission of a bill of costs within 10 days from the date judgment enters, the above named Defendants are granted costs.